[Civ. No. 6418. Fourth Dist. Sept. 23, 1960.]

VISCO FLYING COMPANY, INC. (a Corporation), Respondent, v. HANSEN AND ROWLAND, INC. (a Corporation) et al., Defendants; E. R. H. HILL OF LLOYD'S OF LONDON, Appellant.

C. F. Sturdevant, Jr., for Appellant.

Dickenson, Sattinger & McKee for Respondent.

COUGHLIN, J.—This is an action founded upon a policy of insurance issued by the defendant and appellant to the

plaintiff and respondent insuring the latter against loss arising out of damage to its Piper PA-22 aircraft, which was wrecked in an attempted landing on March 15, 1957. The resultant damage is a proper item of loss if the airplane was covered by the policy at the time of the accident. The defendant claims that coverage did not exist because of exclusionary provisions of the policy which read:

"This insurance does not apply:—

"1. Under any and all coverages while the aircraft with the knowledge and consent of the Assured is being operated in flight:—

"A. In violation of the Civil Aeronautics Administration regulations pertaining to the Airworthiness Certificate. . . ."

The policy of insurance was issued on August 1, 1956 and, by endorsement, covered plaintiff's aircraft which was purchased on January 15, 1957. The accident occurred on March 15, 1957.

On December 17, 1956, before the aircraft in question was purchased, the Civil Aeronautics Administration issued Directive Number 56-26-2 which declared:

"Modifications and inspections of civil aircraft as described below are mandatory. Aircraft which are not modified and inspected as required herein are considered unairworthy and continued flight of such aircraft will be regarded as violations of the Civil Air Regulations. . . .

"Rework the fuel tank caps as shown in the sketch below by drilling two additional .067 holes ¼ of an inch from the existing center hole. . . ."

This directive applied only to certain specifically described Piper PA-22 aircraft. It did not apply to the subject aircraft which, as indicated, was purchased by plaintiff on January 15, 1957. At the time of such purchase the Civil Aeronautics Administration issued an airworthiness certificate thereon. On February 11, 1957, the Civic Aeronautics Administration issued Directive Number 57-3 requiring all Piper PA-22 aircraft, which would include the one involved in this case, to comply with the regulations contained in the directive of December 17, 1956; such compliance to be effected prior to March 1, 1957; but also provided that:

"The C.A.A. will accept modifications . . . equivalent to those set forth in the airworthiness directive and manufacturer's instructions if it is shown that they actually accomplish the required effect. . . ."

Previously, Piper Aircraft Corporation had issued its service

bulletin Number 148 advising modification of the fuel tank caps on aircraft described in the December 17, 1956 directive. but did not issue any bulletin concerning the aircraft of the type purchased by plaintiff until May 29, 1957, when, through bulletin Number 148A, it advised that the fuel tank caps on this type of aircraft complied with the Civil Aeronautics Administration Regulations.

It was stipulated that prior to March 15, 1957, the plaintiff, through its president, James Vedder, had received and had knowledge of the contents of the aforesaid airworthiness directives. At the time of purchase, the fuel tank caps on the subject aircraft were not drilled in accordance with the December 17, 1956 directive, nor were they modified by plaintiff so as to comply therewith. However, there is evidence which supports the conclusion that the fuel tank caps on the subject aircraft were so constructed as to meet the reason for the modification required of other fuel tank caps which were not so constructed; that the size of the air vents in the caps used on the model purchased by plaintiff were large enough so as not to require the two additional holes prescribed by the directives. The reason for drilling the two additional vent holes was to relieve a pressure that built up in the tanks and caused a noise on landing. The fuel tank caps used on plaintiff's aircraft were specially marked with a blue X; had been inspected by the Aviation Safety Agent out of San Diego; did not cause any difficulty in the performance of the aircraft using them; and did not give rise to the noise on landing. Vedder, who was experienced in the flying and maintenance of aircraft, testified that, in his opinion, the tank caps used in plaintiff's aircraft were equivalent in performance to those modified in accordance with the CAA directives. The evidence produced also would sustain an inference to this effect. In addition, this conclusion is corroborated by the action of Piper Aircraft Corporation through issuance of its bulletin 148A, which advised that the tank caps in question complied with CAA regulations, as well as by the subsequent formal approval of these caps by the Federal Aeronautics Administration— successor to C.A.A.—through a directive issued on May 18, 1959.

On March 15, 1957, after its engine stopped at a low altitude, the subject aircraft, in an attempted landing, ran off the runway and overturned. The cost of repairs was $5,400. By this action plaintiff seeks recovery of this amount from

its insurance carrier. From the judgment in favor of plaintiff, the defendant takes this appeal. The issue for determination on appeal is whether the subject aircraft, at the time of the aforesaid accident, was being operated in violation of the February 11, 1957, CAA Directive Number 57-3.

The defendant contends that plaintiff's failure to cause the fuel tank caps on its aircraft to be drilled in accord with the February 11th directive constitutes a violation of Civil Aeronautics Administration Regulations which brings the aircraft within the exclusionary provisions of its policy.

The plaintiff contends that its aircraft was not in violation of the directive in question because the construction of the fuel tank caps installed thereon was such as to make them equivalent to fuel tank caps subjected to the modifications required by the directive and, by the terms thereof, was exempt from its requirements; that any ambiguous language in the directive should be construed in favor of recovery under the policy of insurance; that plaintiff had no knowledge that its aircraft was not airworthy within the meaning of the directive; and, consequently, that any flight thereof in violation of Civil Aeronautics Administration Regulations was not with its knowledge and consent, as is required by the exclusionary provisions of the policy.

There is no showing that the condition of the fuel tank caps on plaintiff's aircraft was a cause of the engine trouble or ensuing accident. The defendant contends that such a showing is not necessary in order to bring the subject aircraft within the exclusionary provisions of the policy.

The directive of February 11, 1956, among other things, provides that: "Modifications . . . are mandatory" and "aircraft which are not modified . . . are considered unairworthy and continued flight of such aircraft will be regarded as violations of the Civil Air Regulations." Without doubt plaintiff's failure to drill the two additional vent holes constituted a violation of the foregoing provisions when they are considered by themselves. However, as noted, the directive also provides:

"The CAA will accept modifications . . . equivalent to those set forth in the airworthiness directive and manufacturer's instructions if it is shown that they actually accomplish the required effect."

The evidence establishes that the vent hole in the fuel tank caps used on plaintiff's model *actually accomplished* the required effect of the two additional holes drilled in the average

fuel tank caps used in Piper PA aircraft. The purpose of drilling the two additional holes was to relieve pressure on the caps during landing which caused an undesirable noise. The larger vent hole in the especially marked cap used on plaintiff's aircraft accomplished this purpose. It is apparent that the intent of the directive was to require the use of fuel tank caps of a design which would accomplish a particular effect and to forbid the use of aircraft equipped with caps which did not accomplish that effect. In view of this obvious intent, it would be unreasonable to construe the directive so as to require the drilling of two additional holes which would be unnecessary to accomplish the required effect, or to prohibit the use of an aircraft equipped with adequate caps at the time of its purchase on the ground that no "modification" takes place by the substitution of adequate for inadequate caps.

The defendant argues that the plaintiff should not be permitted to pass on the adequacy of its equipment to conform to Civil Aeronautics Administration directives and that the decision in this case, in substance, gives it this right. The fallacy in this argument is that the opinion of the plaintiff's president respecting the adequacy of the fuel tank caps on its aircraft not only was the basis for its conclusion in the premises, but also constituted testimony in this case and the court, rather than the plaintiff, determined that the equipment used on plaintiff's aircraft conformed to the requirements of the Civil Aeronautics Administration directive.

The directive states that "CAA will accept modifications . . . equivalent" to those prescribed "if it is shown" that they actually accomplish the required effect. It is not clear whether the term "shown" is used in an abstract sense, meaning the establishment of the fact in any proper manner at such time as the subject comes under inquiry, or whether it requires a showing to a particular entity at a particular time. In the latter event, there is no statement as to whom and when the showing must be made. The directive does not require the owner to make application for approval to the CAA, but rather states that the CAA "will accept" equivalent modifications if it is shown that they accomplish the required effect. With respect to the element of time, it is of interest to note that reference is made to modifications "equivalent to those set forth in the airworthiness directive and manufacturer's instructions," and, that, as heretofore noted, on May 29, 1957, the manufacturer of plaintiff's aircraft issued a bulletin

declaring that the particular cap used therein complied with CAA requirements, and on May 18, 1959, the FAA, successor to CAA, issued a directive approving this type of cap.

The February 11th directive, being an incident to the exclusionary provisions, and plaintiff's conduct with relation thereto must be interpreted in the light of rules governing the interpretation of insurance contracts and proclaiming the policy of the law respecting a recovery thereunder.

"In general, the object and purpose of insurance is to indemnify the insured in case of loss, and ordinarily such indemnity should be effectuated rather than defeated. To that end the law makes every rational intendment in order to give full protection to the interests of the insured." (*Glickman* v. *New York Life Ins. Co.*, 16 Cal.2d 626, 635 [107 P.2d 252, 131 A.L.R. 1292].)

"It is also the rule that exceptions and exclusions are construed strictly against the insurer and liberally in favor of the insured." (*Arenson* v. *National Automobile & Cas. Ins. Co.*, 45 Cal.2d 81, 83 [286 P.2d 816].)

The policy excluded coverage only while the insured aircraft "with the knowledge and consent of the Assured" was being operated in flight in violation of the Civil Aeronautics Administration Regulations. Under this provision, by its terms, unless the plaintiff had knowledge that its aircraft did not conform to the requirements of the fuel tank cap directive, coverage would apply. As heretofore indicated, the February 11th directive required the drilling of two additional holes in the caps on plaintiff's aircraft or equivalent modifications "if it is shown that they actually accomplish the required effect." The latter provision was subject to an interpretation permitting the use of a cap which could be shown to accomplish the required effect. As already noted, the directive did not state to whom or when it should be shown that such a cap would "accomplish the required effect." The evidence supports the conclusion that plaintiff was entitled to believe that its use of the equivalent caps was not in violation of the directive if it could be shown that such caps actually accomplished "the required effect"; that plaintiff believed it could be shown that the caps on its aircraft did "accomplish the required effect"; that such caps actually did "accomplish the required effect"; that its use of the subject aircraft was based on the foregoing interpretation of the directive; and that, if this interpretation is incorrect, its use of that aircraft was made in ignorance of the correct inter-

pretation thereof; and, consequently, its aircraft was being used without knowledge of any violation of the Civil Aeronautics Administration Regulations within the meaning of the policy provisions.

The foregoing conclusions render unnecessary any consideration of the defendant's contention, that a showing of causation between a CAA violation and the loss sustained is not a prerequisite to an application of the exclusionary provisions of the policy.

The judgment is affirmed.

Griffin, P. J., and Shepard, J., concurred.