[Civ. No. 29242.   Second Dist., Div. Two.   Mar. 2, 1966.]

VERDUGO HIGHLANDS, INC., Plaintiff and Respondent,
v. SECURITY INSURANCE COMPANY OF NEW
HAVEN, Defendant and Appellant.

Anderson, McPharlin & Conners and Robert C. Haase, Jr., for Defendant and Appellant.

Sydney J. Dunitz for Plaintiff and Respondent.

ROTH, P. J.—Respondent Verdugo Highlands, Inc., plaintiff below, was in the process of developing property owned by it and located in the City of Glendale into residential lots. A contractor who had commenced grading work required in the project was relieved and respondent engaged G. W. Boggus, Inc. (Boggus) to complete the grading. Pursuant to a contract executed August 16, 1961 (August contract), Boggus was to "furnish all labor, materials, supplies and equipment and do all work necessary to complete in good, substantial and workmanlike manner in place grading improvement work relating to the development of said property described in the attached plans in accordance with the plans, profiles and specifications prepared by Amco Engineers, Owner's engineer."

Appellant Security Insurance Company of New Haven (Surety) executed a Performance and Material and Labor Bond (bond) in the amount of $200,000, insuring Boggus' performance under the August contract.

Prior to the completion of the grading work, Boggus abandoned the project in violation of the terms of the August contract. The surety by the terms of its bond was privileged to enter upon the property and complete the job. It did not do so. The question raised as to whether surety was properly notified is treated *infra*.

Respondent was compelled to and did complete the grading. After completion of the grading at a cost greatly in excess of $0.36 per cubic yard of earth cut, the price fixed by the August contract, respondent filed suit against surety for the difference between the contract price and the actual cost of completion. The trial court found that respondent cut and moved 182,947 cubic yards of dirt, for which the agreement provided payment of $65,862.82 and which cost the respondent a total sum of $269,943.38, or an excess of $204,082.56. Since the limit of the bond was $200,000, the court gave judgment for respondent in that amount less $26,561.66 previously paid by the surety for labor and materials.

At some given time, either prior to or during Boggus' work on the grading (the record is vague), respondent discovered that the tentative grading plans of its engineers required work on property surrounding the tract but not owned by respondent. Negotiations ensued whereby respondent acquired various parcels of land adjacent to and contiguous with the primary tract. It is to be noted that these parcels as acquired (primarily the so-called Donnelly and Stadler parcels) extended

beyond the originally designed grading areas and in the case of the Donnelly property, beyond the edges of the grading plan itself.

During the course of the grading, precisely when is unclear, extra dirt was encountered which had to be disposed of either by hauling off the property or by use on the property. The latter being more economical, additional building pads were designed for the Donnelly and Stadler properties in which the extra materials could be used. Apparently, work in these areas was begun by Boggus, but the major portion of this grading, including the clearing of vegetation and alluvial materials from the areas to be filled, was done by respondent subsequent to Boggus' abandonment.

The surety argues strenuously that the creation of the additional pad areas on the Donnelly and Stadler properties so materially altered the principal contract between Boggus and respondent, that appellant is exonerated from liability under Civil Code, section 2819. Section 2819 provides: "A surety is exonerated . . . if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended."

It is settled that when there is a material alteration of the principal obligation irrespective of whether it is prejudicial, the surety is discharged. (*Barrett-Hicks Co.* v. *Glas*, 9 Cal.App. 491, 497 [99 P. 856]; *Wolf* v. *Aetna Indemnity Co.*, 163 Cal. 597, 605 [126 P. 570]; *First Congregational Church of Christ* v. *Lowrey*, 175 Cal. 124, 126 [165 P. 440]; *Roberts* v. *Security Trust & Sav. Bank*, 196 Cal. 557, 564 [238 P. 673]; *Hill & Morton, Inc.* v. *Coughlan*, 214 Cal.App.2d 545, 548 [29 Cal.Rptr. 550].) A material alteration is one that works a change in the meaning or legal effect of the contract (*Hill & Morton, Inc.* v. *Coughlan, supra*, at p. 549.)

It is clear, therefore, that the validity of appellant's contention hinges on a construction of the bond and the August contract which would exclude from the scope of the undertaking, work done on properties not shown on the original grading plan.

It is to be noted at the outset that the bond itself provides that the ". . . Principal shall faithfully perform the work contracted to be performed under said contract [of August 16, 1961] . . . ." This, in effect incorporates the terms

of the grading contract into the bond, so that the scope of the bond is determined by the limits of the August contract. (*Roberts* v. *Security Trust & Sav. Bank, supra,* at p. 566; *Culbertson* v. *Cizek,* 225 Cal.App.2d 451, 466-467 [37 Cal.Rptr. 548].)

Under Civil Code, section 2837, a contract of suretyship is to be interpreted by the ordinary rules of contract construction. ■ On this subject we think that the observations of the court in *Roberts* v. *Security Trust & Sav. Bank, supra,* at pp. 566-567, are apt: " 'Such construction does not mean that words are to be distorted out of their natural meaning, or that, by implication, something can be read into the contract that it will not reasonably bear; but it means that the contract shall be fairly construed with a view to effect the object for which it was given and to accomplish the purpose for which it was designed. . . .' A bond may incorporate, by reference . . . other contracts, in which case the bond and the contract should be read together and construed fairly and reasonably as a whole according to the intention of the parties. [Citation.] . . . . In other words, we must, in order to ascertain the nature and extent of the liability to which the sureties have bound themselves, examine the language of the undertaking by the light of the agreement, faithful performance of the terms of which it guarantees [citation]; or, as was said by this court, the extent of the surety's liability must be gathered from the language used, when read in the light of the circumstances attending the transaction. [Citation.]"

■ In the case at bench, Boggus, by the August contract, was required to "complete in good, substantial and workmanlike manner in place grading improvement work *relating to the development of said property* described in the attached plans . . . ." (Italics added.)

This and other language appearing in the August contract[1] indicated that the grading plan at the outset was merely an estimate and that the project was to be flexible. There was

---

[1]Paragraph 10 of the agreement provides: "Any changes of grades or elevations that deviate from the approved plans and specifications and which entail any additional or less yardage or quantities of material shall be paid for or credited at the unit contract price . . . ."

Paragraph 15 provides: ". . . All prior estimates and payments shall be subject to correction in the final estimate and payment."

Paragraph 21 defines what shall be considered as rock by the parties and provides for certain payment for blasting and hauling in the event such rock is encountered.

considerable expert testimony that hillside urban developments such as the one at bench involve many unknown and unforseen obstacles which require alteration from the original plans; that such plans are considered in the industry to be subject to alteration as the project progresses; and that changes in the ultimate number, size, and elevation of graded lots is a usual occurrence.

In the instant case, the grading plan incorporated by reference into the bond was designed, as are most such plans, to balance the cuts (removal of dirt from the hillside) with the fills (deposits of additional dirt). This is done so that all dirt removed on the project can be disposed of in the immediate area, eliminating hauling costs while simultaneously creating usable building pads. Understandably, a balance will be achieved only if the terrain allows strict adherence to the original lot design, and shrinkage factors upon compaction of the fill are as estimated. In this case, an overage of fill was somehow created, a not unusual occurrence, due to no fault of respondent. In order to dispose of this overage, additional lots were created on the Donnelly and Stadler properties which were at lower elevations. There was abundant evidence that such disposal was proper and of benefit to both the respondent and Boggus, and that the availability of these areas for disposal of the extra dirt was fortunate for all concerned.

Usage and custom are, of course, acceptable aids in the interpretation of contracts (Civ. Code, § 1655; Code Civ. Proc., § 1870, subd. 12; 1 Witkin, Summary of Cal. Law (1960) p. 253, and cases cited.) In light of the evidence of such usage and custom, and the circumstances prevailing at the execution of the August contract and the bond, we think that the events leading up to the creation of additional pads on the Donnelly and Stadler properties, were within the foreseeable scope of the August contract and therefore implicitly became a part of the bond.

The evidence outlined amply sustains the trial court's finding that the additional grading work on the disputed parcels was work "relating to the development of said property described in the [original grading plan] . . . ."

The surety also argues that respondent failed to notify the surety promptly upon default of the contractor in accordance with the terms of the bond, and that such failure exonerates the surety (*Union Indemnity Co.* v. *Lang,* 71 F.2d 901, 905.) This contention is not supported by the record.

The bond requires "That in the event of any default on the part of the Principal written notice thereof shall be given to the Surety as promptly as possible, and in any event within ten (10) days after such default shall have become known to the Owner . . . ." The grading contract provides in paragraph 6: ". . . In no event shall the completion date exceed seventy (70) working days based on a five (5) day work week from the 16th day of August, 1961; provided, however, that any time lost due to any of the events specified in paragraph 23 below shall be added to the seventy (70) working day period called for herein." Paragraph 23 provides for an extension of time "by reason of any act or negligence on the part of the Owner or any of his agents or by reason of any act of God, inclement weather, labor disputes, war, riot or any calamity for which the Contractor is not responsible." Had no delay occurred, Boggus would have been required to complete the grading by the end of November 1961. However, Boggus did not abandon the project until January 18, 1962. Telegraphic notice to the surety was sent the following day. This notice was amplified by letter on January 23, 1962. There is substantial evidence in the record that the delay was caused not by Boggus, but by events extending time for performance within the meaning of paragraph 23 above.[2] It is clear, therefore, that Boggus was at no time in default within the meaning of the August contract, until his abandonment of the project. Prompt notice of default was given to the surety as required by its bond.

The surety's third contention rests on the following provision of the grading contract: "The unit prices set forth in paragraph 2 hereof shall be the basis of payment and a final field determination of quantities shall be made by Amco Engineers." Appellant contends that a "final field determination" was never made and that the trial court therefore erred when it found "That plaintiff performed each and every act required of it by said Agreement prior to the abandonment thereof by G. W. Boggus, Inc. . . . ." In support of this argument, appellant cites *Bowers Hydraulic Dredging Co. v. United States*, 211 U.S. 176, 185 [29 S.Ct. 77, 53 L.Ed. 136]; *Franklin A. Snow Co. v. Commonwealth*, 303 Mass. 511 [22

---

[2]The record supports a finding that the delay was caused by the intervention of respondent's geologists, rain and mud, engineering errors, accidents, extra dirt, and design changes caused by resistant rock and blasting.

N.E.2d 599, 602]; *Ward* v. *Smith,* 140 W.Va. 791 [86 S.E.2d 539, 548-549].)

Undoubtedly, these cases and the law of contracts generally require a plaintiff suing on a contract to demonstrate that he utilized the method of measurement specified in the contract, and no other, even if another method is accurate or customary. In the case at bench, respondent, the plaintiff below, has introduced evidence that it has complied with the August contract in this respect. The record shows that Amco Engineers, the firm required to make final field determination by the August contract, determined those quantities through the use of aerial photogrammetrics[3] based on field-determined check points on the ground. Norman Rubin, the photogrammetrist for Amco was asked: "Q. Would you tell the Court whether the method by which these maps were prepared constituted a field determination as you so understand it?" Mr. Rubin's response was as follows: "A. Well, a field determination, as I see it, is based on measurements that begin on the ground in the field. . . . In our method, which is indirect to the degree that we have identified on the photograph a series of *field determined values*, we then set this up in a stereoscopic plotting device and make a series of interpolations which is *based on a network of field control*, so that *the map in itself basically is field determined*, in my opinion." (Italics added.)

From the foregoing testimony, the trial court could have determined that respondent had utilized the method of measurement required by the August contract.[4]

█ The surety also complains that the record demonstrates that respondent failed to retain 5 percent of the

[3]Photogrammetrics is a method of making maps from photographs. Under the method used by Amco for determining quantities of dirt moved a comparison of aerial photogrammetric maps was made before and after the unknown quantity was actually moved.

[4]The court sustained a question put to a witness on the ground that a conclusion was being called for when the witness was asked whether the method of computation used was correct. The court said: ". . . This is the computation that he made.

"Whether or not it's accurate or not is going to depend on me, I think; so he can give us the results of his computation, the amount; and then whether that's right or not, that's up to me."

We note also that appellant is in no position, from an equitable standpoint, to complain about the methods used in determining its liability. After Boggus abandoned the project, Boggus hired its own engineer to investigate the matter of earth quantities as determined by Amco. Mr. McIntire, Boggus' engineer, checked the methods used by Amco and was in substantial agreement with Amco on the quantites which Boggus had moved and which remained to be moved. Moreover, respondent's attorney, on February 1, 1962, wrote a letter to appellant

progress payment to Boggus as required by the August contract. This complaint is supported by a finding of the trial court that "G. W. Boggus, Inc. was overpaid $14,189.51 for the work it performed under said Agreement." This failure, surety asserts, exonerates the bond under the rule stated in *County of Glenn* v. *Jones,* 146 Cal. 518, 521 [80 P. 695, 2 Ann.Cas. 764].)

The overpayment referred to, however, was clearly one made because of initial overestimates of the quantity of dirt moved by Boggus, and not due to a failure to retain 5 percent of any progress payment. Such overpayments do not discharge a surety (4 Williston, Contracts (rev. ed.) § 1243, and cases cited.) There is no evidence whatsoever to support the assertion that no retention was made. Indeed, the evidence on this issue is all to the contrary.

The surety's final contention is that a letter from Amco to respondent showing the quantities of earth moved by respondent after the abandonment by Boggus was admitted without foundation. This contention is without merit. The authenticity of such a writing is a question of fact for the trial court. (*Chaplin* v. *Sullivan,* 67 Cal.App.2d 728, 734 [155 P.2d 368].) In the case at bench, the record leaves no doubt of the authenticity of the disputed writing. Moreover, in view of the evidence indicating that this writing was prepared in the regular course of business, at or near the time of the measurement of quantities, the court properly exercised discretion granted under the Uniform Business Records as Evidence Act. (Code Civ. Proc., § 1953f.)

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.

A petition for a rehearing was denied March 16, 1966, and appellant's petition for a hearing by the Supreme Court was denied April 27, 1966.

---

which contained the following paragraph: "My client has caused to be completed an aerial photographic survey, which is now being reduced to contour, so that quantities of dirt already moved and to be moved for completion will be available in the immediate future." Nothing in the record indicates that any complaint about the methods used by Amco or respondent was ever made by the surety until trial.