[Civ. No. 10001. Fourth Dist., Div. Two. Mar. 16, 1971.]

GRAYDON-MURPHY OLDSMOBILE, Plaintiff and Appellant, v. OHIO CASUALTY INSURANCE COMPANY, Defendant and Respondent.

**COUNSEL**

Getz, Aikens & Manning and George E. Leaver for Plaintiff and Appellant.

Swarner, Fitzgerald & Dougherty, H. M. Dougherty and Ray Lapica for Defendant and Respondent.

## OPINION

**KERRIGAN, J.**—This is an action on an insurance contract for loss sustained by reason of the dishonest acts of an employee in embezzling her employer's funds. Plaintiff, the corporate employer, was insured under an employee dishonesty policy issued by the defendant-insurer in the sum of $10,000. The policy became effective on January 28, 1964.

Dixie Mason was plaintiff's office manager. During the three years prior to the commencement of the aforesaid policy, she embezzled $33,436. Following execution of the policy, she stole an additional $14,750. In early November 1964, she advised her employer that she was going to terminate her employment on November 13. On that date, she met with her superior and confessed that she had stolen an estimated $28,000 over a period of years. At the same time, she offered to deed 80 acres of land in San Diego County to plaintiff and agreed to make restitution of the balance at the rate of $400 per month, commencing in January 1965. She signed an informal memorandum to such effect at the time she confessed, but not a formal conveyance.[1]

On November 20, 1964, plaintiff filed an action against Dixie Mason in the Los Angeles County Superior Court and attached the San Diego real property.

On or about December 10, 1964, plaintiff filed a proof of loss and made a $10,000 demand upon defendant for full payment under the policy. Defendant offered to honor the demand provided plaintiff would transfer its interest in the San Diego acreage to it (the insurer). Plaintiff refused. Defendant countered by denying plaintiff's claim.

Plaintiff continued with the Los Angeles suit and obtained a judgment against Dixie Mason in the amount of $49,189 plus costs in January 1965. The San Diego land was executed upon, and plaintiff netted $20,000 from the execution sale. Dixie made a $600 payment upon the restitution agreement, but paid nothing further. Consequently, plaintiff's total recovery amounted to $20,600.

Plaintiff then brought this action on the insurance contract, seeking to

---

[1]Dixie left California immediately after confessing and offering to make restitution. Apparently she never deeded the San Diego acreage to plaintiff.

compel defendant to pay the full amount of the policy. The matter was heard by the court sitting without a jury. Plaintiff contended that the $20,600 recovered from Dixie Mason should first be applied to the earlier embezzlements, that defendant receive no credits, and defendant should pay the full amount of the policy. Defendant contended that it did not have to pay for three reasons: (1) the recovery should be credited against the bond as provided under section 10 of the policy; (2) plaintiff had made a material misrepresentation in its application for insurance by affirmatively indicating that its books were subjected to an annual audit; and (3) plaintiff's action against Dixie Mason, which led to the judgment against her and recovery of $20,600, prejudiced the subrogation right of defendant under section 14 of the policy. The trial court found in favor of defendant on all issues, and entered judgment accordingly.

Plaintiff, in effect, raises the same three issues on appeal: (1) section 10 of the policy is not applicable to the facts; (2) there was no material misrepresentation; and (3) none of plaintiff's actions prejudiced defendant's subrogation rights.

Section 10 of the policy provides:

"If the insured shall sustain any loss covered by this Policy which exceeds the applicable amount of insurance hereunder, the insured shall be entitled to all recoveries [except from suretyship, insurance, reinsurance, security or indemnity taken by or for the benefit of the company] by whomsoever made, *on account of such loss under this Policy* until fully reimbursed, less the actual cost of effecting the same; and any remainder shall be applied to the reimbursement of the Company." (Italics supplied.)

■ Inasmuch as the evidence in the case at bar is uncontradicted, the interpretation of the policy is solely a judicial function, and a reviewing court is not bound by the interpretation of the trial court. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) ■ In performing our function, several elementary principles must be kept in mind. An instrument in writing is to be construed most strongly against the party who drafted it or caused it to be drafted. (Civ. Code, § 1654; *Laux* v. *Freed,* 53 Cal.2d 512, 524 [2 Cal.Rptr. 265, 348 P.2d 873].) ■ The effect and purpose of insurance is to indemnify the insured in case of loss and, ordinarily, such indemnity should be effectuated rather than defeated; to that end, the law makes every rational intendment in order to give full protection to the interest of the insured. (*Visco Flying Co.* v. *Hansen & Rowland,* 184 Cal.App.2d 829, 835 [7 Cal.Rptr. 853].)

■ Plaintiff maintains that section 10 does not apply to the money

recovered because there has been no showing that the recovery was "on account of such loss under this Policy," and that the section does not cover the present situation where there are both pre- and post-policy period losses.

Defendant argues that the policy provision is clear and unambiguous, and provides that plaintiff must offset any and all recoveries made during the policy period against all losses incurred during the policy period; since $14,750 was lost and $20,600 was recovered, the insurer is not indebted for any sum under the policy.

We hold that section 10 of the policy is not applicable to the entire recovery. The recovery is not entirely attributable to either the pre-policy or post-policy losses. Section 10 applies only insofar as the loss is identifiable as being a loss "covered by this Policy." Therefore, the trial court's finding that the insurer receive credit for the entire recovery cannot stand.

Plaintiff has maintained throughout the proceeding that it is entitled to the entire recovery. Plaintiff argues that codified rules of interpretation (see Civ. Code, § 1654) militate against the insurer, and that the insurer was able to protect itself by inserting a provision which covers the instant situation; since defendant did not expressly provide for a situation wherein the insured sustained pre-policy and post-policy losses that, in the absence of instructions by a debtor or a specific application by the creditor, the recovery should be applied to the obligation maturing earliest. (See Civ. Code, § 1479.) Defendant contends that allowing the plaintiff to credit the recovery to the earlier losses would be tantamount to extending the term of the policy and forcing it to insure a risk which it did not contract to insure. Neither party has considered apportionment of the recovery as a solution.

In *City Trust & Savings Bank* v. *Underwriting M. of Lloyds,* 109 F.2d 110 [126 A.L.R. 943], there were both pre- and post-policy losses. Certain moneys recovered were directly traceable to a post-policy loss. The evidence showed that the identical money which had been stolen was recovered. Conseqeuntly, both the loss and recovery cancelled each other out, and there was no apportionment. However, in *Commercial Standard Insurance Co.* v. *Liberty Plan Co.,* 283 F.2d 893, there were losses from two distinct sources. A recovery which could not be traced to either loss was prorated between the two.

In the case at bar, the recovery was from two sources: the $20,000 derived from the execution sale and two cash payments totaling $600 made by the embezzler. The property had been deeded to Mrs. Mason by her parents in 1950. No evidence was introduced as to the source of the cash payments. Since the recovery was obtained solely from collateral sources,

we hold that the doctrine of apportionment be applied and the recovery prorated.

The total of Mrs. Mason's embezzlement was $48,186. Prior to issuance of the Ohio Casualty policy, $33,436 [69.39%] was taken. After the policy became effective, $14,750 [30.61%] was stolen. Apportioning the $20,000 recovery in those percentages, $14,294.34 of the fund is applicable to the pre-policy loss; the remaining $6,305.66 is a recovery of the loss incurred during the policy period.

Section 10 of the policy, although it does not apply to the entire recovery, does direct the method of allocating the said $6,305.66 recovery, since it is the recovery of a loss under the policy. It provides that the insured first receive credit for the recovery to the extent that its loss exceeded the policy limit until fully reimbursed. The remainder is then applied to the reimbursement of the insurer. The loss during the policy period was $14,750 and the policy limit was $10,000. The insured is therefore first entitled to $4,750, the amount of the loss sustained in excess of the policy limits. The remaining $1,555.66 is to be credited to the defendant-insurer, reducing the amount due under the policy to $8,444.34.[2] Consequently, plaintiff is entitled to an award of $8,444.34.

■ The second contention raised by appellant is that the finding that there had been a material misrepresentation in the application is unsupported by the evidence. In the application for insurance, plaintiff represented that it had an annual "audit" of its cash and accounts performed by a C.P.A. Plaintiff's C.P.A. testified that his work consisted of tax consulting, preparation of corporate tax returns, and embraced the preparation of a financial statement, a beginning and ending balance sheet, and a profit and loss statement. Incident to that work, he checked to see if the books were in balance, which entailed taking trial balances of all the income tax accounts and the liabilities, determined if there were schedules to support all the receipts and liabilities, and checked the bank reconciliation, accounts receivable, car inventories, prepaid insurance, and fixed assets. He spent some 15-20 hours annually on the Oldsmobile agency account.

In discussing the meaning of the term "audit" plaintiff's accountant indicated that when the word was not preceded by the word "certified" it

---

[2] The mathematics under section 10 of the policy are as follows: $14,750 (actual loss) — $10,000 (policy limit) = $4,750 (amount of loss not covered by insurance); $6,305.66 (the portion of the recovery apportioned to post-policy loss) — $4,750 (amount of loss not covered by insurance) = $1,555.66 (the amount to be credited to the insurer); $10,000 (policy limit) — $1,555.66 = $8,444.34 (the recovery to which the insured is entitled).

had varied meanings and was a very general term which could mean virtually any examination of records.

Defendant presented a C.P.A. who testified that the work performed, as described by plaintiff's accountant, did not constitute an "audit," but was merely the preparation of a tax return. The manager of Ohio Casualty's bond department testified that on the strength of the application he had approved the bond, but that he would not have done so had he known no "audit" was performed.

Webster's Seventh New Collegiate Dictionary (1969) defines "audit" in the following manner: "1 a: a formal or official examination and verification of an account book; b: a methodical examination and review; 2: the final report of an examination of books of account by auditors."

The meaning of the term "audit" in the insurance application under review is susceptible of a wide variety of meanings. The only evidence bearing on the issue of the meaning of the word "audit" was that the term was very general and could mean a perfunctory examination of the type performed by the Internal Revenue Service. Although defendant's financial expert described the work performed by plaintiff's accountant as "the preparation of a tax return," and stated that "audit" has a specialized meaning to the accounting profession, that has no bearing on the meaning of the term "audit" to the insured. Unless it is obvious that a word was used in its technical sense, it will be given the meaning that common speech imports. (*Pendell* v. *Westland Life Ins. Co.,* 95 Cal.App.2d 766, 770 [214 P.2d 392].) ■ Any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. (*Gray* v. *Zurich Insurance Co.,* 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].) Consequently, the findings of the trial court was erroneous.

■ The final attack raised by plaintiff is directed towards the finding that its actions materially affected defendant's subrogation rights under section 14 of the policy.

Section 14 provides: "In the event of any payment under this Policy, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after loss to prejudice such rights."

Plaintiff argues that there is no evidence of any prejudice since none of

its activity after the loss had been discovered worked any injury to defendant. Defendant maintains that inasmuch as the insured dealt directly with the dishonest employee without the insurer's knowledge and obtained an agreement which culminated in the consent judgment, that the insurer is thereby relieved from any liability under the policy. As authority for its position, defendant places heavy reliance on situations where a surety's rights have been altered (see Civ. Code, § 2819) and is entitled to exoneration because the insured's action resulted in a material alteration of the principal obligation, irrespective of whether the surety was prejudiced thereby. (See *Verdugo Highlands, Inc.* v. *Security Ins. Co.,* 240 Cal.App. 2d 527, 530 [49 Cal.Rptr. 736].)

But the foregoing rules do not apply to the instant situation. We hold that there must be a showing of *actual* prejudice. Defendant does not contend that the land was sold at less than full value, nor that any additional assets could have been obtained from Dixie Mason.

The evidence indicates that prior to mailing the proof of loss to the insurer, plaintiff secured a confession and repayment agreement from Mrs. Mason, filed a complaint, and attached the land in San Diego. Shortly thereafter, defendant was notified of the loss and kept informed of all developments in the litigation which culminated in the execution sale.

When the loss was discovered Mrs. Mason had terminated her employment and was about to depart to a new home and job in Nevada. The need for immediate action was obvious. Furthermore, only a portion of the losses were covered by the insurance policy. Defendant cannot successfully urge that plaintiff was required to disregard the pre-policy loss and attempt only to secure the insurer's position under the policy. Plaintiff acted in the best interests of both parties in pursuing the course of action it did.

The insurer has suffered no prejudice. The net effect of plaintiff's activity was to substitute a judgment in place of a cause of action. Mrs. Mason remained liable for the unrecovered loss. Consequently, the finding is without evidentiary support.

As a final note, plaintiff contends that it is entitled to interest on the amount due from December 10, 1964, the date of the insurer's refusal to pay. In view of the rule of law applied herein for the first time, it cannot be said that damages were certain. Therefore, the request for interest is denied.

The judgment is reversed and the trial court is directed to enter judgment for plaintiff in the amount of $8,444.34 in San Bernardino Superior

Court Action No. 125767, Graydon-Murphy Oldsmobile, a California corporation, Plaintiff, versus The Ohio Casualty Insurance Company, a corporation, Defendant.

Tamura, Acting P. J., and Kaufman, J., concurred.