**JAMES B. LANSING SOUND, INC.,**
**Plaintiff/Appellant,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania corporation, Defendant/Appellee.**

No. 84–6630.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 5, 1985.

Decided Oct. 15, 1986.

Shirley M. Hufstedler and Seth M. Hufstedler, Hufstedler, Miller, Carlson & Beardsley, Los Angeles, Cal., for plaintiff/appellant.

Lisa B. Margolis and Michael D. Dempsey, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, Beverly Hills, Cal., for defendant/appellee.

Before GOODWIN, SCHROEDER, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

This is an appeal in a diversity of citizenship insurance case in which California law controls. James B. Lansing Sound, Inc. ("JBL"), a Delaware corporation with its principal place of business in California, appeals a judgment by the district court, sitting without a jury, denying recovery in JBL's action for breach of its comprehensive employee dishonesty insurance policy against National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National"). The case was tried on stipulated facts pursuant to a Pre-Trial Conference Order limiting the issues of fact and law to be tried.

Two of JBL's employees perpetrated a complex fraud on JBL, which sought recovery from National Union. The insurance company denied liability because it contend-

ed that JBL should offset amounts received from payments made by one of the employees to JBL for equipment fraudulently sold. The district court agreed and also subjected JBL's losses to allocation with those under a second insurance company's dishonesty policy. Finally, the court held that the measure of JBL's loss was the cost to JBL to remanufacture the sound equipment, and did not include commissions paid to one of the defrauding employees or freight charges fraudulently billed to and paid by JBL. Because we find that the insurance policy is ambiguous in regard to the proper measure of loss, we conclude that the wholesale price rather than the manufacturing cost is the proper measure, and we reverse in part.

## FACTS

### The Insurance

This case involves two "Comprehensive Dishonesty, Disappearance and Destruction" insurance policies issued by National to JBL. The first policy was in effect from December 15, 1978 to February 29, 1980, and provided for a maximum liability coverage of $2.5 million for loss of money, securities, and other property through any fraudulent or dishonest act committed by an employee. Any loss to JBL prior to December 15, 1978 is recoverable under the National policy to the extent that the loss would have been covered and recoverable had the National policy been in effect at the time of the loss. The second National policy, insuring against the same risks, was in effect from March 1, 1980 through June 30, 1980, and provided for a maximum liability coverage of $10 million. While the first National policy was in effect, in December, 1979, JBL obtained a "Comprehensive Crime Policy" from the Insurance Company of North America ("INA"), which provided for substantially the same and overlapping coverage as the National policy, with provision for maximum liability coverage of $2.5 million. Each policy contained a like "excess insurance clause" designed to protect insurers against double

recovery. After June 30, 1980, INA's policy provided JBL's sole insurance coverage.

For purposes of this litigation, there are four time periods during which damage to JBL occurred. The parties agree that during the first period (Period A) from June, 1977 until December, 1979, National is solely liable for covered losses JBL incurred. The parties also agree that during the final period (Period D), from June 30, 1980 onward, National assumes no liability for JBL losses. The parties dispute the proper allocation of covered losses in the two time periods (Period B, December 1, 1979 to February 29, 1980, and Period C, March 1, 1980 to June 30, 1980) during which JBL had double coverage from National and INA.

### The Fraud

JBL is a Los Angeles manufacturer and seller of stereo equipment and speakers. Russell Mott was JBL's exclusive sales representative for California and Nevada, and received a seven percent commission calculated on the invoice price (without discount) on all goods ordered through him. Richard Bernal was a salaried employee working as an accountant in JBL's marketing department, and had access to JBL's computer.

In March, 1977, Mott, with the cooperation of dishonest Northern California dealers, submitted large, fictitious purchase orders for JBL equipment in the name of the dealers. Bernal received these fictitious orders and caused JBL's computer to issue shipping documents for the equipment to be freighted to San Francisco. In fact, Mott and Bernal sent the equipment to another Los Angeles firm, which in turn shipped the equipment to Japan. The trucking company which transported the equipment to the Los Angeles firm charged JBL for fictitious shipments to San Francisco, and JBL paid these fraudulent freight charges. Bernal also caused JBL's computer to issue invoices applying lower than normal sales prices (usually the previous year's wholesale prices) on the fraudulently sold equipment, and to change the terms of JBL's normal 10 percent discount for payments made within 30 days to 10 percent

discount for payments made within 90 days. The fraudulently lowered invoice prices permitted Mott to sell the equipment to unauthorized Japanese dealers and undercut authorized Japanese JBL dealers. Mott would then take the receipts from the fraudulent sales and pay JBL the discounted amounts. Although Mott's payments were made around 90 days after invoicing, the payments did not appear delinquent because of the altered computer discounts. Mott received his regular seven percent commission on the sales.

After JBL discovered the fraud, it submitted its proof of loss to INA and to National. INA settled with JBL, but National maintained that JBL incurred no recoverable losses. JBL then brought this action for breach of its insurance contract.

### JBL's Losses and National's Liability

In its trial brief and at oral argument in the district court, JBL asked for $666,451 as compensation for (1) loss of merchandise (based upon fair market value), (2) loss of commission payments, and (3) loss of freight payments.[1] National maintained that JBL had no recoverable losses, because the amounts JBL claimed either were offset by payments made by Mott or were profits and thus excluded under the terms of the policy. National also asserted that JBL must first deduct $100,000 under the terms of the policy.

The parties have computed JBL's losses in two ways—JBL's total losses for the entire operation of the scheme, broken down into the four time periods, and its allocated losses calculated by percentage of insurance coverage between the National and INA policies during the four time periods. As the parties agreed, National is liable for 100 percent of JBL's covered losses during Period A, and zero percent during Period D. The parties disagree on the appropriate allocation, if any, of the recoverable losses during Periods B and C. They stipulated, however, that if the court determines that the appropriate allocation is to be based upon the respective policy limits of National and INA, then National would be liable for 50 percent of JBL's covered losses during Period B and 80 percent during Period C.[2]

INA ultimately settled with JBL, paying it $553,343, of which $47,468 is attributed to that period in which both INA and National insured JBL.

The district court found that the 100%–50%–80%–0% allocation was the appropriate measure of National's liability. The court applied these proportions both to JBL's losses and to the payments from Mott, which it held should be offset against the insurance company's liability. The court also held that, under the terms of National's policy, National had properly exercised its option to pay JBL the "replacement cost" for JBL's lost goods, and that this cost was measured by JBL's replacement cost (i.e. cost to manufacture the equipment) and not National's replacement cost (i.e. cost to go into the market and purchase like equipment for JBL). Included in

---

1. At trial, JBL sought recovery for losses of merchandise ($2,834,455 at fair market value), fraudulent freight payments ($47,067), and commissions paid to Mott ($191,249), totaling $3,072,771, plus other unspecified loss of intangible property. These figures are JBL's total, unallocated losses incurred during Periods A, B, and C. Subtracting the amount INA paid in settlement ($47,468) and the amount paid by Mott ($2,358,852) for Periods A, B, and C, JBL's claimed unallocated losses during the three periods that National's policies were in effect total $666,451. On appeal, JBL would add losses suffered during the period (Period D) that was only covered by the INA policy: merchandise fraudulently obtained by Mott ($1,465,161 at fair market value), plus commissions to Mott ($92,619), plus freight ($29,152), less payment by INA in settlement ($505,875), less payments by Mott ($782,352) totaling $298,705. Adding this figure to JBL's trial prayer, JBL now seeks $965,156, attorneys fees and costs, plus pre-judgment and post-judgment interest.

2. The parties stipulated that if National's and INA's liability was to be apportioned, the correct apportionment for National's liability for covered losses was 50 percent for Period B (National's coverage for that period was $2.5 million; INA's coverage was $2.5 million; the ratio is 2.5 [National]: 5.0 [National + INA] = 50%) and 80 percent for Period C (National's coverage was $10 million; INA's was $2.5; the ratio is 10:12.5 = 80%).

JBL's replacement costs were materials and labor, other manufacturing costs, and administrative costs. Excluded were variable selling expenses, fraudulent freight payments, commission payments to Mott, marketing expenses, and profits. The bottom line was that JBL was held entitled to $1,691,075 under the terms of National's policy, which was offset by Mott's allocated payments of $1,940,175. Therefore, the court held JBL was not entitled to any further recovery from National. Because National had no actual liability to JBL, it was unnecessary for the court to address National's assertion that it was entitled to a $100,000 deductible.

## DISCUSSION

### Standard of Review

■ The interpretation of a contract presents a mixed question of law and fact subject to **de novo** review. *Hanson v. Prudential Insurance Co.*, 783 F.2d 762, 764 (9th Cir.1985); *see also Interpetrol Bermuda, Ltd. v. Kaiser Aluminum International Corp.*, 719 F.2d 992, 998 (9th Cir.1983). Under California law, where the evidence is uncontradicted, the interpretation of the policy is solely a judicial function, and a reviewing court is not bound by the interpretation of the trial court. *Graydon-Murphy Oldsmobile v. Ohio Casualty Insurance Co.*, 16 Cal.App.3d 53, 57, 93 Cal.Rptr. 684, 687 (1971).

■ The existence of an ambiguity must be determined as a matter of law. *State Farm Mutual Automobile Insurance Co. v. Fernandez*, 767 F.2d 1299, 1301 (9th Cir.1985). Under California law, any uncertainties or ambiguities in insurance contracts are construed against the insurance company. *Hanson*, 783 F.2d at 764; *Endo Laboratories, Inc. v. Hartford Insurance Group*, 747 F.2d 1264, 1268 (9th Cir.1984); *Previews, Inc. v. California Union Insurance Co.*, 640 F.2d 1026, 1029 (9th Cir. 1981); *Reserve Insurance Co. v. Pisciotta*, 30 Cal.3d 800, 807–08, 640 P.2d 764, 768, 180 Cal.Rptr. 628, 632 (1982).

## Analysis

### I. Coverage and Losses

National's Comprehensive Dishonesty, Disappearance and Destruction Policy, Insuring Agreement I (Employee Dishonesty Coverage) provides that National agrees, subject to conditions, limitations, and other terms, to pay the Insured for:

Loss of Money, Securities and other property which the Insured shall sustain, to an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability applicable to this Insuring Agreement I, through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others.

JBL contends that the phrase "other property" covers all losses, tangible and intangible, and thus includes losses of merchandise (at fair market value), fraudulent freight payments, and commissions paid to Mott. National argues that JBL normally paid commissions and freight from its sales receipts (profits), and that these are not insurable losses. The parties also dispute the proper valuation of the equipment fraudulently sold.

### A. Value of Merchandise

Section 9 of the policy's "Conditions and Limitations," entitled "Valuation—Payment—Replacement," provides in part:

In case of damage to the Premises or loss of property other than Securities, the Company shall not be liable for more than the actual cash value of such property, or for more than the actual cost of repairing such Premises or property or of replacing same with property or material of like quality or value. The Company may, at its election, pay such actual cash value, or make such repairs or replacements.

The district court held that under this provision, National had an election to pay the "actual cash value" (fair market value) for the lost property, or it could pay the replacement cost. Further, the court held that replacement cost must mean JBL's replacement cost (cost for JBL to manufac-

ture the equipment), and not National's replacement cost (cost for National to go into the market and purchase like equipment to replace JBL's loss), because if replacement cost were National's replacement cost, National would have no effective election between actual cash value or replacement costs, for both are measured by fair market value.

Although the district court's interpretation is a reasonable one, **de novo** review of this contract clause as a whole persuades us that its meaning is not without ambiguity. The first sentence of the clause limits National's liability to not more than "actual cash value" or "actual cost of ... replacing [the property] with property or material of like quality or value."[3] The policy does not define what is meant by "actual cash value," nor does it indicate whose "actual cost" is to be the measure of replacement cost.

We agree that "actual cash value" means fair market value (usually the list or wholesale price). As the district court recognized, the troubling question is whether "actual cost" of replacement is to be JBL's actual cost to remanufacture or National's actual cost to go into the market and purchase replacement equipment. Contrary to the district court's suggestion, we are not certain that National's actual cost to enter the market and purchase replacement equipment is necessarily the same as fair market value. An insurance company could well possess sufficient market power to purchase replacement equipment of like quality and value at a cost below the insured's wholesale list price. We find the first sentence of the clause ambiguous with regard to the meaning of replacement cost.[4]

■ Furthermore, the second sentence also is ambiguous regarding National's election to **pay** actual cash value or to **make** replacement. The election to make

the replacement was with National; the clause does not expressly give National the election to require JBL to make its own replacement. The option was inserted in the policy for the insurance company's benefit. An insurer loses any right to exercise an election to limit its liability to replacement costs if it has neither replaced the property nor given timely notification of its intention to do so. *See* 2 Rhodes, *Couch on Insurance 2d,* ¶ 15:48 (Rev. ed. 1984); *see also* 16 B. Appleman, *Insurance Law and Practice,* § 9082 (Rev. ed. 1981).

National also asserts that to award JBL fair market value would be to give JBL both the cost of manufacture and the profits it would have obtained on legitimate sales; National argues that the policies at issue are property loss policies and not lost profits policies. National relies on two endorsements which exclude recovery of losses the proof of which is dependent upon an inventory or profit and loss computation, and losses which are potential income such as interest and dividends. The proof of losses that JBL suffered did not require an inventory or profit and loss computation, nor does fair market value include potential income in the nature of interest and dividends.

We find that the clause is ambiguous and, absent other factual indications demonstrating the parties' intent, we must resort to familiar principles of insurance contract interpretation. The effect and purpose of insurance is to indemnify the insured in case of loss and, to that end, the law makes every rational inference in order to give full protection to the interest of the insured. *Graydon-Murphy Oldsmobile,* 16 Cal.App.3d at 57, 93 Cal.Rptr. at 687. An instrument in writing is to be construed most strongly against the party who drafted it or caused it to be drafted. *Id.*

---

3. Section 9 also provided that if the parties disagreed upon the cash value or costs of replacement, such values would be determined by arbitration. The record reveals no evidence of arbitration.

4. Section 9 was not tailored for JBL's policy but is a clause generally used. Whether National could purchase the specific equipment lost in this instance at a cost below JBL's wholesale price is therefore irrelevant.

■ Under these principles, and applying California's policy of resolving ambiguities in favor of imposing liability, *see* Standard of Review, *supra*, we conclude that the proper measure of JBL's equipment loss is the stipulated fair market value, or whole-sale list price, and not JBL's cost of reman-ufacture. We also find that the list price as a measure of loss must be allocated to National based on relative National and INA policy limits, as the parties have stipu-lated. *See* Part II, *infra*. Thus, the first figure to enter into the computation of National's liability to JBL is $2,335,811.

## B. Freight Payments

Because the district court believed that section 9, *supra*, was dispositive of the suit, it did not address the parties' other arguments regarding the parameters of National's policy coverage. JBL argues that the phrase "other property" in Insur-ing Agreement I, *supra*, covers intangible losses resulting from employee fraud, in-cluding the fraudulent freight payments and commissions it paid to Mott.

In *Imperial Insurance, Inc. v. Employ-ers' Liability Assurance Corp.*, 442 F.2d 1197 (D.C.Cir.1970), a substantially identi-cal insuring agreement was construed to include intangible losses where the in-sured's employee caused the insured to is-sue unauthorized lines of insurance deplet-ing the insured's cash flow. The court explained that

> [t]he loss here was a pecuniary depletion of [the insured's] monetary assets. In that sense it was a loss of its property. ... It is true this gives a meaning to the policy not explicitly expressed. But it obtains support from the general pur-pose of the policy to protect against loss due to the fraudulent or dishonest con-duct of an employee. To adopt a more

restrictive interpretation ... is not re-quired, particularly since the whole of the definition leaves unclear what is in-tended by the loss of "other property."

442 F.2d at 1199.

Mott and Bernal caused JBL to pay for fraudulent freight charges. The loss was a pecuniary depletion of JBL's monetary as-sets. "Other property" is not defined else-where in National's policy, yet the phrase follows the terms "Money" and "Securi-ties," which are commonly regarded as in-tangible personal property, *see, e.g.*, 3 Wit-kin, *Summary of California Law* § 25, pp. 1636 *et seq.* (8th ed. 1973).

The parties have stipulated, however, that JBL normally paid the shipping costs for purchase orders of the size involved in this scheme. National objects that to award JBL both fair market value for the lost equipment and the freight payments would be to give JBL a double recovery, because JBL would have paid the freight from the profits it made on the sale. In *Geddes & Smith, Inc. v. Saint Paul Mer-cury Indemnity Co.*, 63 Cal.2d 602, 610, 407 P.2d 868, 873, 47 Cal.Rptr. 564, 569 (1965), the court held that "expenses which would have been incurred [freight costs] even if the [damaged] doors had not been installed cannot be considered damage to the houses, and therefore such items are not within the terms of the insurance poli-cy."

■ We hold that because the freight payments were a cost that JBL would have normally absorbed, this cost must be in-cluded within the fair market value or list price, for which National is already liable. Thus, we hold that National is not addition-ally liable for its allocated portion of the freight charges.[5]

---

**5.** There remains a question whether JBL should be entitled to the difference in the amount it was charged for the fictitious freight shipment to San Francisco and the actual freight charges that would have been incurred had it been known that the equipment was to go to Los Angeles and then to Japan. This issue, how-ever, has not been adequately raised in the

briefs submitted, nor is there any indicia in the stipulation of evidence of the amount of freight costs that JBL would have absorbed on ship-ments to Japan. We therefore do not reach this issue. *International Union of Bricklayers & Al-lied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir.1985).

### C. Mott's Commissions

■ JBL argues that "other property" also includes the seven percent commissions that JBL paid to Mott on the fraudulent sales. Endorsement 196A provides that:

Dishonest or fraudulent acts ... shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent:

\* \* \* \* \* \*

(b) to obtain financial benefit for the Employee ... **other than** salaries, **commissions**, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits **earned in the normal course of employment.**

(emphasis added). This provision clearly indicates that National excluded liability for paying fraudulent or dishonest commissions. Though JBL argues that fraudulent sales of its equipment were not its normal course of business, under JBL's theory, the exclusion of commissions would have no meaning or effect because fraud or dishonest acts are not usually part of a normal course of business. Moreover, the commissions paid were expenses that JBL would have incurred even if the merchandise had been sold at the list price. Furthermore, JBL obtained the benefit of its agreement with Mott, i.e., it obtained 93 percent of the invoice price and paid Mott seven percent, its normal course of business.

We hold that the commission payments are excluded by the unambiguous terms of Endorsement 196A. Those payments could not be included in the intangible "other property" recovery in any event, as they were made under JBL's normal procedure, and would have been incurred anyway. *See Geddes*, 63 Cal.2d at 610, 407 P.2d at 873, 47 Cal.Rptr. at 569. *See also Howard, Weil, Labouisse, Friedrichs, Inc. v. Insurance Co. of North America*, 557 F.2d 1055, 1056 (5th Cir.1977) (affirming district court's decision holding insurer liable under substantially similar employee dishonesty policy for losses caused by employee less the commission the employer would have been obligated to pay the employee were it not for his dishonesty).

### II. Prorating National's Liability

■ Both National's and INA's policies contained a like "excess insurance clause." Section 13 of the "Conditions and Limitations" of National's policies provides:

If there is available to the Insured any other insurance or indemnity covering any loss ... the Company shall be liable hereunder only for that part of such loss which is in excess of the amount recoverable or recovered from such other insurance or indemnity....

The district court correctly held that California law is clear that "[w]hen two or more applicable policies contain excess insurance clauses, ... liability ... should be prorated according to the amount of coverage afforded." *Continental Casualty Co. v. Pacific Indemnity Co.*, 134 Cal.App.3d 389, 397, 184 Cal.Rptr. 583, 586–87 (1982); *see also Travelers Insurance Co. v. Transport Indemnity Co.*, 6 Cal.3d 514, 517, 492 P.2d 683, 685, 99 Cal.Rptr. 627, 629 (1972). Thus, the district court applied the parties' stipulation that if National's and INA's liability was to be apportioned, the correct apportionment for National's liability for covered losses was 50 percent for Period B and 80 percent for Period C. *See* footnote 2, *supra*.

JBL argues that this rule applies only to actions between insurers, and never applies to permit an insurer to defeat its liability to the insured, nor does it apply where an insurer has denied liability on its policy. JBL also contends that once INA settled and paid JBL, INA's payment became "primary" and National became liable for all of the excess. In the two California cases cited by the district court, however, one of the insurers had settled with the insured, and sought indemnification from the other insurer. *See e.g., Travelers Insurance Co.*, 6 Cal.3d 514, 492 P.2d 683, 99 Cal.Rptr. 627 (1972); *Continental Casualty Co.*, 134 Cal.App.3d 389, 184 Cal.Rptr. 583 (1982). The courts in these two cases held that the rule of proration applied.

Although it is true that in this case, it is not the settling insurer that seeks to impose proration against the denying insurer, absent contrary authority, the California law applying proration between two insurers with like excess insurance clauses is controlling. We agree with the district court's ruling on this issue, and hold that National's liability must be prorated according to the amount of coverage.

### III. Offsetting National's Liability By Mott's Payments

■ As part of the scheme, Mott paid JBL $3,141,204 for the equipment that was fraudulently discounted and sold to unauthorized Japanese dealers. National contends, and the district court agreed, that this amount must be offset against JBL's losses. Further, the court used the parties' stipulated apportionment formula and apportioned Mott's payments for the four periods of insurance coverage. National, being 100 percent liable for covered losses during Period A, received 100 percent of Mott's offsetting payments identified to that period. Likewise, National offset 50 percent of Mott's payments during Period B, 80 percent during Period C, and received no offset during Period D, as the parties agreed that National was not liable for any losses during that period. Thus, National received credit by way of offset for $1,940,-175 of Mott's payments to JBL for equipment ordered and sold during the scheme.

JBL asserts that Mott's payments cannot offset National's liability, and must first be applied to JBL's losses that were uninsured or unrecoverable, or which occurred during

that period (Period D) when INA's policy provided sole coverage. JBL complains that the district court "cited no authority for its conclusions, and no such authority exists. Authority is to the contrary." It is JBL, however, that provides no authority for its contentions.[6]

In *Graydon-Murphy Oldsmobile*, 16 Cal. App.3d at 58, 93 Cal.Rptr. at 687, under very similar circumstances, the court held that an insured's recovery from a dishonest employee must be apportioned between the time that the insurer's policy was in effect and the time when it was not in effect, and that the insurer could apply its proportionate part of the recovery against the insured's losses, notwithstanding that the insurer denied liability and refused to pay. *Cf. Commercial Standard Insurance Co. v. Liberty Plan Co.*, 283 F.2d 893, 894 n. 1 (10th Cir.1960) (prorating amount of recovered embezzled money because money could not be traced to specific source and offsetting that amount against insurer's liability); *City Trust & Savings Bank v. Underwriting Members of Lloyds*, 109 F.2d 110, 111 (7th Cir.1940) (where there were pre- and post-policy losses caused by employee's theft and recovered stolen money could be traced, both the loss and the liability cancelled each other out).

We hold that Mott's payments of $1,940,-175, as allocated under the parties' stipulated formula, should be applied against JBL's covered losses ($2,335,811 as calculated in Parts I and II, *supra*), thereby offsetting National's liability in proportion to the extent of National's coverage. Sub-

---

6. Citing "settled insurance law," JBL argues that an insurer cannot set off payments by a tortfeasor to its insured to reduce its liability in advance of paying the loss. JBL cites "equitable principles" to the effect that an insured has equitable entitlement to apply payments from a tortfeasor first to all losses that are uninsured or unrecoverable. Thus, JBL seeks to recover losses that it incurred solely during the period when INA provided the only coverage, notwithstanding its agreement that National is not liable for losses during that time. Likewise, JBL seeks to recover its attorneys fees and costs from Mott's payments despite its admission that such fees and costs are excluded from the policy's coverage.

JBL does cite a number of subrogation cases to support its position. As the district court observed, and as JBL admits, the law of subrogation does not apply to the facts of this case. This is not a situation where an insurer is entitled to step into the shoes of the insured and be subrogated to amounts owed by the insured's debtor. Rather, the issue of Mott's payments involves the determination of what loss JBL suffered. As the district court explained, "National Union questions the very basis of JBL's claim that any loss occurred ... noting that JBL was paid for the merchandise it sold to Mott, albeit at a fraudulently reduced price." Thus, JBL's subrogation analysis is inapposite.

tracting Mott's allocated payments thus results in an intermediate calculation of $395,636 owed by National to JBL.

## IV. Deductible Amount

█ Because the district court found that Mott's payments exceeded the replacement value of the lost equipment, it did not decide whether the $100,000 deductible provision applied. Because we hold that the proper measure of National's liability is the fair market value of the fraudulently sold equipment, Part IA, *supra*, and because that amount is greater than the amount of Mott's offsetting payments, we must decide whether the deductible amount applies. We hold that it does.

National's Endorsement 46A (¶ 1) provides that:

The Company shall not be liable under Insuring Agreement I on account of loss through acts ... committed at any time, whether before or after this Endorsement is effective, by any Employee ... unless the amount of such loss, after deducting the net amount of all reimbursement and recovery ... obtained ... by the Insured, other than from any bond or policy of insurance issued by a surety or insurance company and covering such loss ... shall be in excess of One Hundred Thousand Dollars ($100,-000), and then for such excess only....

As found on the face of this Endorsement, the purpose is "TO PROVIDE A DEDUCTIBLE AMOUNT UNDER INSURING AGREEMENT I."

JBL contends that this endorsement requires JBL to absorb the first $100,000 of its net **uninsured** losses, and that because JBL's uninsured losses were over $100,000, this endorsement has no application against its insured losses. This is not a reasonable interpretation of the endorsement, because uninsured losses are losses not covered by Insuring Agreement I. Further, it could not be the parties' reasonable expectation that an insurer calculate the risk to be covered and sell insurance protection for that risk, while permitting an insured to expand the scope of the coverage by applying a deductible against those risks that

were not covered and not paid for. *See Howard, Weil, Labouisse, Friedrichs, Inc. v. Insurance Co. of North America,* 557 F.2d 1055 (5th Cir.1977) (holding that a substantially similar deductible provision was to be applied against the entire insured loss).

We hold that JBL must deduct $100,000 from its insured losses. Subtracting this amount from National's liability as calculated in Parts I, II, and III, *supra,* yields a total liability of $295,636 owed by National to JBL.

## V. Interest

### A. Pre-Judgment Interest

JBL seeks pre-judgment interest on its claim as of October 23, 1981, the date that National allegedly denied liability. National argues that if the court awards JBL a recovery, no pre-judgment interest should be awarded because the damages were not capable of being made certain by calculation. Alternatively, National argues that if damages are held to be capable of calculation, then the date from which pre-judgment interest should run is July 16, 1983, the date the parties stipulated that JBL submitted sufficient information for its claim to be calculated.

█ State pre-judgment interest rules are to be applied in diversity cases. *Jarvis v. Johnson,* 668 F.2d 740, 746 (3rd Cir.1982) (citing cases); *see also Turner v. Japan Lines, Ltd.,* 702 F.2d 752, 756 n. 4 (9th Cir.1983). California Civil Code § 3287(a) (West 1970) provides that pre-judgment interest shall be awarded as a matter of right on damages certain or capable of being made certain by calculation from the day upon which the right to recover vested.

The California Supreme Court has held that " '[d]amages are deemed certain or capable of being made certain ... where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' " *Leff v. Gunter,* 33 Cal.3d 508, 519, 658 P.2d 740,

748, 189 Cal.Rptr. 377, 385 (1983) (citation omitted). The California courts have interpreted this provision to permit recovery of interest on damages recovered by an insured from the insurer where the insured had **"furnished the insurer with data from which the loss could be ascertained** and where such data was substantially disputed by the insurer." *Executive Aviation, Inc. v. National Insurance Underwriters,* 16 Cal.App.3d 799, 808, 94 Cal.Rptr. 347, 353 (1971) (emphasis in original).

■ Although the parties stipulated that they "did not and do not agree concerning the principles that govern the calculation of the amount, if any, owed to JBL," they also stipulated that "[b]y July 16, 1983, National Union had enough information in its possession to calculate the amount of JBL's claim." We find that the parties' disagreement really involves a dispute over the meaning of a policy term and not the resulting calculation of the amount of damages. National admits it had sufficient information since July 16, 1983 to calculate the amount of JBL's claim. Accordingly, we hold that National must pay JBL pre-judgment interest at the legal rate from that date.

We are aware that in contexts other than insurance, there is authority that damages deemed uncertain militate against an award of pre-judgment interest where judicial determination on conflicting evidence is required, *Block v. Laboratory Procedures, Inc.,* 8 Cal.App.3d 1042, 1046–47, 87 Cal. Rptr. 778, 780 (1970), or where there is a large discrepancy between the amount of damages demanded and the size of the eventual award, *Polster, Inc. v. Swing,* 164 Cal.App.3d 427, 435, 210 Cal.Rptr. 567, 572 (1985). If there is any ambiguity in the construction of the California statute, we believe that the California Supreme Court would be persuaded that, particularly in insurance cases, when all the information has been submitted from which the loss may be calculated, the insured should not be deprived of the use of the amount determined to be due because of a dispute over the meaning of a policy term. Moreover,

the insurance company should not incur any loss by being required to pay pre-judgment interest from the date it was furnished with appropriate data, because it has had the use of the money while the dispute over the policy terms has been litigated.

JBL is entitled to pre-judgment interest at the legal rate from July 16, 1983.

### B. Post-Judgment Interest

Rule 37 of the Federal Rules of Appellate Procedure provides that "[i]f a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest." Post-judgment interest is determined by federal law. Title 28 U.S.C. § 1961(a) (1982) provides that interest "shall be allowed on any money judgment in a civil case recovered in a district court" to be "calculated from the date of the entry of the judgment." Prior to its amendment in 1982, section 1961(a) provided that interest was to be awarded "at the rate allowed by State law." 28 U.S.C. § 1961(a) (1976). In 1982, this section was amended to read that interest "shall be calculated ... at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price ... of ... United States Treasury bills...." 28 U.S.C. § 1961(a) (1982).

JBL seeks post-judgment interest from the date the trial court should have awarded its damages. JBL relies on *Turner v. Japan Lines, Ltd.,* 702 F.2d 752, 756–59 (9th Cir.1983) (post-judgment interest on erroneously granted JNOV held to run from the date the correct judgment should have been entered). *Japan Lines* is inapposite to the instant case. In *Japan Lines,* there was an original jury verdict which awarded plaintiffs damages that was subsequently overturned JNOV; in this case, however, there was no original award in the district court.

■ In *United States v. Hougham,* 301 F.2d 133 (9th Cir.1962), the plaintiff sought

post-judgment interest from the date of the first judgment on additional damages awarded in a second judgment following a remand. This court held that "post-judgment interest should be calculated from the date of the entry of the judgment in which the money damages, upon which interest is to be computed, were in fact awarded." *Id.* at 135. We hold that post-judgment interest shall be awarded from the date of the entry of judgment in accordance with the terms of this opinion.

## CONCLUSION

Because we have found the insurance policy ambiguous regarding the value of JBL's loss of equipment, applying familiar principles of California insurance contract interpretation, we reverse the district court in part and remand with directions that the district court enter a judgment that National is liable to JBL for the fair market value of the equipment as provided in this opinion. In the following particulars we affirm the district court's rulings. We hold that the fair market value of the equipment must be allocated in proportion to the amount of coverage under National's and INA's policies. National is not additionally liable for either the fraudulent freight payments or the commissions paid to Mott. Mott's allocated payments must be set off against National's liability, and JBL must deduct $100,000 from its covered losses. As explained in this opinion, these calculations result in a total award to JBL of $295,636. We award pre-judgment interest from July 16, 1983, because we have found that JBL furnished National with data from which the loss could be ascertained and such data was not substantially dis-

puted by National. Post-judgment interest at the prescribed rate will accrue from the date of the entry of the revised judgment.[7]

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

7. Each party will absorb its own attorneys fees and costs in accordance with the terms of the policy and the stipulation of the parties limiting the issues to be tried. The policy excludes "[a]ll costs, fees and other expenses incurred by the Insured in establishing the existence of or amount of loss," and as noted in footnote 6, *supra,* JBL admits that this provision means "litigation expense." Thus, attorneys fees and costs are not allowable under the policy, and we have held that Mott's payments are to be applied against JBL's covered losses, which do not include fees and costs. We also observe that as

the stipulation of facts was incorporated into the pretrial order, JBL is bound by that stipulation. *E.H. Boly & Son, Inc. v. Schneider,* 525 F.2d 20, 23 n. 5 (9th Cir.1975). Furthermore, JBL is bound by its agreement to limit the issues to be tried. *Waggoner v. Dallaire,* 649 F.2d 1362, 1369 (9th Cir.1981). Because the issue of attorneys fees was not included in the pretrial order and the stipulation of facts contains no facts relating to JBL's attorneys fees, that issue would be precluded on appeal in any event.