**PUROLATOR SECURITY, INC., et al., Appellants,**

v.

**The CITIZENS NATIONAL BANK OF WACO, Appellee.**

No. 5574.

Court of Civil Appeals of Texas, Waco.

Feb. 10, 1977.

Rehearing Denied March 10, 1977.

Louis S. Muldrow, Naman, Howell, Smith & Chase, for Purolator Sec., Inc.

Sherwin A. Winniford, Haley, Fulbright, Winniford, Bice & Davis, Waco, for Commercial Ins. Co. of Newark, N. J.

David B. Kultgen, Beard & Kultgen, Waco, for appellee.

HALL, Justice.

At all pertinent times, the book store and the cashier's office at Baylor University, in Waco, transacted their banking business with the appellee, the Citizens National Bank Of Waco, in this fashion: Mrs. Marcell Thomas, an employee in the cashier's office, and Mrs. Marie Harden or Mrs. Richard Moyle, employees in the book store, would telephone the armored car teller at the Citizens Bank and place an order for cash to be used by their respective department in its daily business. These orders are called "change orders." Bank would fill the order, put it in a sealed bag, and place a tag on the bag designating the place of delivery. The bag would then be handed to an employee of the appellant, Purolator Security, Inc., an armored motor vehicle company, for delivery to Baylor. Purolator was employed by Baylor for this service. Many other of Bank's depositors in Waco, who also employ Purolator for this purpose, were serviced by Bank in this fashion. Bank's armored car teller was furnished a list of the personnel of the various accounts

with whom he could deal in this manner. He was also familiar with the voices of those who called for change orders. He was under instruction to immediately call the depositor and verify the order if an unfamiliar name or voice placed an order, and he did so.

Ordinarily, Purolator made a morning run and an afternoon run to Baylor, Monday through Friday. Mrs. Thomas would receipt for the change orders delivered to the cashier's office, and Mrs. Harden or Mrs. Moyle would receipt for those delivered to the book store. It was not uncommon on these runs for Purolator to pickup a deposit from either place for delivery to Bank. We might add that money was never ordered by, nor delivered to, any other department at Baylor. Specifically, money was never ordered by the Student Aid Office, there.

A swindler, using the name "George Clark," who was not at all associated with Baylor, learned of this system of business between Bank, the cashier's office, the book store, and Purolator. On Friday, December 14, 1973, assuming an air of familiarity with all involved, he called the armored car teller at Bank, identified himself as "George Clark with Student Aid" at Baylor, and placed a change order for bills of varying denominations totaling $13,620.00. He also called Purolator, and apprised it of an order at Bank for Baylor. Bank filled the order, put it in a small, sealed bag, and placed a tag on the bag with notations on it reading, "George Clark," "Mrs. Thomas," "Cashier," "$13,620.00," in that sequence. Although Bank's armored car teller was not familiar with the name "George Clark" or Clark's voice, and had never before received an order from Student Aid at Baylor, he did not attempt to verify Clark's order or authority.

Purolator's driver, Fitch, picked up Clark's order from Bank's armored car teller at about 1:00 P.M. on the day in question. When he did so, he signed a receipt reading, "Given to P.S.I. Armored Motor Service, Inc., from CNB for Baylor. Received by and correct as to number of packages /s/ Fitch." Fitch also either picked up or already had in his possession two bags of change orders for delivery to the book store. Additionally, he had orders for customers other than Baylor.

Fitch arrived at the cashier's office at Baylor at about 3:00 P.M. Meanwhile, Clark had contacted Mrs. Moyle at the book store and Mrs. Thomas at the cashier's office, identified himself as "George Clark with Student Aid," and let them know that he was expecting a change order from Bank. He asked Mrs. Thomas if the order could be left at the cashier's office by Purolator for him, and she told him it could. Thereafter, he placed several calls to Mrs. Thomas and also to Mrs. Moyle inquiring whether his order had arrived.

When Fitch arrived at the cashier's office with the order, Mrs. Thomas knew or at least assumed "it was for George Clark," because she had no order coming. She signed the receipt for it. Almost simultaneously, she received a telephone call from Clark inquiring about the money. She told him Fitch was there, and asked if he would like to speak with Fitch. He said he would, and she handed the telephone to Fitch. Clark then asked Fitch to deliver the money to him at the book store, and Fitch agreed to do so. Fitch scratched through Mrs. Thomas's signature on the receipt, picked up the change order, and left the cashier's office. The book store was only a short distance away in another building.

Immediately after talking with Fitch, Clark telephoned Mrs. Moyle and told her the change order he sought was going to be delivered to the book store. At this particular time, the students at Baylor were ending the Fall Term, turning in books, cashing checks, and preparing for the Christmas vacation, and the book store was "very, very busy." A few minutes after Clark's call, Fitch arrived at the book store with the two bags of money ordered by the book store, plus Clark's order. Clark was not there. Fitch waited several minutes, but Clark did not show. Mrs. Harden paged

him on the book store's public address system. Clark still did not show. Fitch became concerned about time to make the remainder of his afternoon run. As an accommodation to Purolator and Bank, Mrs. Harden offered to receipt for the money for ultimate delivery by her to Clark. This was done, and Fitch left. Soon thereafter, Clark appeared at the book store, signed a receipt, received the money, and left. Neither he nor the money has since been located by the parties.

At the time of this occurrence, Bank was the insured under a policy issued by the appellant, Commercial Insurance Company of Newark, New Jersey. In its pertinent parts, the policy contains these provisions:

### DECLARATIONS

4. Offices Covered.—All the insured's offices in existence at the time this bond becomes effective are covered under this bond except the offices located as follows: NONE.

### INSURING AGREEMENTS
### ON PREMISES

(B) Loss of Property (occurring with or without negligence or violence) through . . . theft, false pretenses . . . while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere, except in an office listed in Item 4 of the Declarations.

．　　．　　．　　．　　．

### IN TRANSIT

(C) Loss of Property (occurring with or without negligence or violence) through theft . . . misplacement . . . being lost or otherwise made away with . . . while the property is in transit anywhere in the custody of any person or persons acting as messenger, except while in the mail or with carrier for hire, other than an armored motor vehicle company, for the purpose of transportation, such transit to begin immediately upon receipt of such Property by the transporting person or persons, and to end immediately upon delivery thereof at destination.

Bank prosecuted its case against Purolator (and now seeks to affirm the judgment in its favor) on theories that the bailment between them was for their mutual benefit; that Purolator violated this bailment, misdelivered the change order, and thereby converted Bank's money when Fitch failed to leave the order at the cashier's office and undertook to deliver it to Clark at the book store; and that whether either party acted negligently is not an issue. Bank also joined Commercial as a defendant, pleading for recovery of its loss under the insurance policy.

Trial was to a jury. Answering the seven special issues submitted to it, the jury (1) found that Bank directed that the change order in question "be delivered to the cashier's office at Baylor University"; (2) failed to find that Fitch "delivered" the change order when it was presented to Mrs. Thomas at the cashier's office; (3), (4), (5) found that Bank negligently failed "to indicate clearly to the armored car service where and to whom the Bank intended the money to be delivered," and that this negligence was a proximate cause of the loss in question; and (6), (7) found that Bank's failure "to confirm or verify the authenticity of George Clark, and his authority to order money in behalf of Baylor University," was negligence which proximately caused the loss.

Based upon these findings and upon Commercial's insurance policy, judgment was rendered in favor of Bank against Purolator and Commercial, jointly and severally, for $13,620.00.

The findings of negligence and proximate cause against Bank are supported by proof and are not contested.

Among other grounds for reversal, Purolator asserts that it was an involuntary bailee under the circumstances, liable only for gross neglect or bad faith action; that its requested issues inquiring whether it was also directed to deliver the money to

Clark should have gone to the jury; and that, in any event, the jury's findings that Bank negligently caused the loss, without findings that Purolator was negligent, requires a judgment in Purolator's favor. Because we agree with this last contention, we need not discuss the others.

The record shows without dispute, and all agree, that the parties involved in this transaction were equally and completely flimflammed by Clark. Although, under the issues submitted, the jury found a misdelivery by Purolator, it also found, in effect, that the misdelivery was proximately caused by Bank's negligence.

 Ordinarily, a bailee is not liable for loss of property attributable to the fault or negligence of the bailor. *Vollmer v. Stoneleigh-Maple Terrace*, 226 S.W.2d 926, 928 (Tex.Civ.App.—Dallas, 1950, writ ref.); 11 Tex.Jur. 151, Carriers, § 384. Bank says this rule does not apply in cases of misdelivery by the bailee, stating that the misdelivery is a conversion and that contributory negligence is not a defense in conversion cases. We disagree. Although we find no cases in point involving a private carrier like Purolator, the rule in question has been uniformly applied against bailor-shippers in actions by them for misdelivery by common carrier bailees who would otherwise have been liable for the misdelivery as converters and insurers. 13 C.J.S. Carriers § 174, p. 351; 13 Am.Jur.2d 912, Carriers, § 438; Dobie, *Bailments And Carriers* (1914), p. 424, § 141. Accordingly, it should obtain here in favor of Purolator. We hold it does.

Commercial seeks reversal of the judgment against it on the theory that the evidence establishes as a matter of law that Fitch effected delivery of the change order to Mrs. Thomas at the cashier's office; and that the money was not therefore "in transit" at the time of loss within the meaning of paragraph (C) of the insuring agreements of the insurance policy, supra. Alternatively, Commercial asserts the jury's failure to find a delivery to Mrs. Thomas, in answer to special issue no. 2, is against the great weight and preponderance of the evidence. For the reasons that follow, we overrule these contentions as being immaterial to Commercial's liability.

Under paragraph (B) of the policy's insuring agreement, supra, Bank's loss of money by theft was insured by Commercial if it occurred while the money was "lodged or deposited within any offices or premises located anywhere." The book store office and premises at Baylor where Clark finally obtained possession of Bank's money meet the unqualified loss location of this provision. Any doubt as to the intended meaning of this provision must, of course, be construed against Commercial. *Continental Cas. Co. v. Warren*, 152 Tex. 164, 254 S.W.2d 762, 763 (1953).

The judgment against Purolator is reversed, and judgment is rendered that Bank take nothing against Purolator. The judgment against Commercial is affirmed.

The costs of this appeal are taxed against Commercial.