**FEDERAL SAVINGS & LOAN INSUR-ANCE CORPORATION, Plaintiff,**

v.

**TRANSAMERICA INSURANCE COMPANY, Defendant.**

No. CV 84–4444 FFF.

United States District Court, C.D. California.

May 6, 1987.

Harold J. Kwalwasser, A. James Roberts, III, Spurgeon E. Smith, Tuttle & Taylor, Los Angeles, Cal., for plaintiff.

George C. Montgomery, Rene J. Gascou, Jr., Ashley White, Montgomery, Gascou, Gemmill & Thornton, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION

FERNANDEZ, District Judge.

Transamerica Insurance Company ("Transamerica") issued a Savings and Loan Blanket Bond to Northwestern Savings & Loan Association ("Northwestern"). When Northwestern suffered a loss, Transamerica denied coverage, and Federal Savings & Loan Insurance Corporation ("FSLIC") ultimately brought this action to recover under the bond. It also sought punitive damages.

Both FSLIC and Transamerica have filed summary judgment motions. The Court will grant those motions in part, and deny them in part.

While the motions cover various issues, only the following will be considered in this Opinion: (1) Is Northwestern's loss of securities covered by the bond; (2) what jurisdiction's law should apply to determine the availability and amount of punitive damages, if any; and (3) where FSLIC has recovered funds from others, how should those recoveries be applied, and what is the effect on Transamerica's liability?

## I. FACTS

Transamerica is a California corporation with its principal place of business in Los Angeles, California. It maintains sales offices in St. Louis, Missouri and in Collinsville, Illinois.

Northwestern was a Missouri savings and loan association, with its principal place of business in St. Louis, Missouri. Its assets were insured by FSLIC.

Northwestern obtained a Savings and Loan Blanket Bond, Standard Form 22 ("the bond") from Transamerica. Negotiations for the bond took place in St. Louis, Missouri, and all of the initial steps involved in underwriting the bond took place there. While completion of the underwriting, review, and approval of the bond took place at Transamerica's head office in California, the bond itself was delivered to Northwestern in Missouri. The form of the bond was drafted by the insurance industry's trade association, The Surety Association of America, in consultation with FSLIC and others.

The bond was in the face amount of $1,250,000. It became effective on May 13, 1981.

Northwestern purchased certain federal book entry securities (two Treasury Notes and one Federal Farm Credit System Bond). Federal book entry securities are evidenced by computer entries, which show the indebtedness of various federal agencies, such as the United States Treasury and the Federal Farm Credit System. Those entries are recorded and maintained in the Federal Wire System, which is operated by the Federal Reserve System and member clearing banks.

In July of 1981, Northwestern deposited the securities in question with Comark, a company registered under the laws of California as a broker/dealer, with its principal offices in California. Comark was a company that dealt in federal securities.

Northwestern's securities were to be held in safekeeping. Comark told Northwestern it was doing that. Safekeeping means that securities are held in such a way that they will only be handled as and when the owner expressly directs. They are not to be comingled with the securities of the holding brokerage firm.

Despite Comark's assurances to Northwestern, the securities were in fact comingled with Comark's own assets. Comark only maintained a single clearing account for all federal book entry securities, including those owned by it and those owned by its customers. That account was maintained at Marine Midland Bank, N.A. ("Marine Midland"), and Marine Midland acted as Comark's clearing agent for all of its book entry government securities.

Comark was well aware of the fact that its handling of the securities was illegal and was inconsistent with its duties to Northwestern. Nevertheless, it did not reveal the true situation to Northwestern or to Marine Midland. Rather, it concealed the facts, made false representations to Northwestern, and even obtained loans from Marine Midland, which were secured by all of the securities in Comark's clearing account, including those of Northwestern.

Comark then ran into severe financial difficulties, and when Marine Midland ultimately demanded payment of the loans, Comark defaulted. On June 3, 1982, Marine Midland seized all of the securities in Comark's federal book entry securities clearing acocunt, including those of Northwestern. Marine Midland then sold the securities and kept the proceeds. The market value of Northwestern's securities was then $2,024,174.

Northwestern was informed of the loss on June 15, 1982, and presented a claim to Transamerica on October 20, 1982. Northwestern understandably asserted that the loss was due to the fraudulent acts of Comark, and claimed that the provisions of the bond covered the loss.

Transamerica investigated the claim through its offices in St. Louis, Missouri and Collinsville, Illinois, and also used the services of a law firm located in St. Louis, Missouri. That law firm recommended that the claim be rejected. The final decision was made in Los Angeles, and on August 2, 1983, the denial of the claim was transmitted from Transamerica's Los Angeles Office.

In the meantime, Northwestern itself had fallen on hard times, and on March 15, 1983 FSLIC facilitated the merger of Northwestern into Roosevelt Savings & Loan, whose principal place of business is also in Missouri. Shortly thereafter, FSLIC entered into a formal assistance agreement with Roosevelt and, among other things, received an assignment of all of Roosevelt's and Northwestern's interests arising out of the loss of the securities. This action followed.

After Transamerica's rejection of coverage, FSLIC did not remain inactive. Rather, it sought relief from other sources. Without any aid from or participation by Transamerica, FSLIC was able to recover the following amounts:

(1) An action entitled *Wichita Federal Savings and Loan Association v. Comark*, No. 82 Civ. 4073 (MEL) (S.D.N.Y.) (the "Marine Midland Action") was settled pursuant to an agreement dated October 23, 1985, and FSLIC received $367,557.62.

(2) An action entitled *First Federal Savings and Loan Association v. Oppenheim, Appel, Dixon & Co.*, No. 85 Civ. 4163 (MEL) (S.D.N.Y.) (the "OAD Action") was settled pursuant to an agreement dated June 23, 1986, and FSLIC received $967,721.44.

(3) FSLIC also recovered $10,000 from Comark's broker-dealer bond carrier.

(4) FSLIC's attorneys fees and expenses incurred in the Marine Midland action were $386,921.82. Its attorneys fees and expenses incurred in the OAD action were $126,417.95. Its attorneys fees and expenses incurred in recovering on the broker-dealer bond were $3,983.

(5) FSLIC also has a claim on behalf of Northwestern in the bankruptcy case of *In Re Comark*, Case No. SA–03850–AP (United States Bankruptcy Court, C.D.Cal.). As of February 9, 1987, FSLIC had not received a recovery from Comark's estate.

## II. DISCUSSION

A. *Is the loss of the securities covered by the bond?*

The main focus of this case must be the bond itself, and the centerpiece of the dis-

pute over the bond is Insuring Agreement (B), which reads:

> (B) Loss of Property (occurring with or without negligence or violence) through robbery, burglary, common-law or statutory larceny, theft, hold-up, or other fraudulent means, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof, and loss of subscription, coversion, redemption or deposit privileges, through the misplacement or loss of Property, while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere, except in the mail or with a carrier for hire, other than an armored motor vehicle company, for the purpose of transportation.

Although this language may not be the clearest imaginable, the Court does not believe that it takes an epopt to apply it to the facts of this case. Three portions of the language must be considered: Were the federal book entry securities property; were they lost by the mentioned means; and were they on premises located anywhere?

█ The question of whether the securities were property need not detain the Court for long. The bond's definition section 1(b) defines property in very broad terms, and specifically includes "securities, evidences of debts, and debentures...." Clearly enough, the federal book entry securities are property. *See, e.g., First National Bank of Decatur v. Insurance Company of North America,* 424 F.2d 312 (7th Cir.1970).

On the question of whether the loss was by the means mentioned in the paragraph, one would have to ignore the language of the provision and blink at reality to find that the securities were lost by a method that is not listed there. As will be noted later, there are some disputes about whether California or Missouri law should apply to this case. Either would reach the same result. In fact, California would call this a larceny [California Penal Code § 484(a)] and Missouri would call it stealing [Missouri Revised Code § 570.030(1)]. In any event, Comark's actions were at least

fraudulent. Courts have consistently interpreted "other fraudulent means" in a broad manner, and this Court sees no reason for deviating from those interpretations. *See, e.g., First National Bank of Clinton v. Insurance Company of North America,* 606 F.2d 760, 768 (7th Cir.1979); and *Merchants-Produce Bank v. United States Fidelity and Guaranty Co.,* 305 F.Supp. 957, 966–67 (W.D.Mo.1969). Comark's actions involved lying to Northwestern and to Marine Midland. They also involved the use of Northwestern's assets to secure Comark's own debts, and ultimately resulted in the loss of those assets. The fact that all of this was accomplished in the white collar world of banks and computers, rather than on the streets, is of no consequence.

Finally, the most serious dispute revolves around the meaning of "lodged or deposited within any offices or premises located anywhere...." Transamerica earnestly argues that the only rational construction of this provision is "any *of the insured's* offices or premises located anywhere...." Transamerica goes on to note that wherever the securities may have been, they were not on Northwestern's own premises. As a result, says Transamerica, it cannot be held responsible under the bond.

The Court does not agree with that interpretation of the bond. Rather, the Court construes the "on premises" language to mean exactly what it says. That language provides coverage for property lost while lodged or deposited within any person's offices or premises. Ownership of the offices or premises by the insured is not required by the words of Insuring Agreement (B). The other provisions of the bond are in harmony with this interpretation.

First of all, the very next clause in Insuring Agreement (B) would be surplusage if the Court's interpretation were not correct, since it is obvious that property in the mail or with a carrier for hire would not be on the insured's premises. There would be no reason whatever to eliminate those particular places, if no place but the insured's own premises were covered by the preceding clause.

Second, this construction is consistent with the remainder of the agreements in the bond. The specific phrase, "insured's offices" is used in numerous other places throughout the document [1], which indicates that the drafter knew how to specifically limit the sweep of the language when that was desired. The drafter also used the word "anywhere" elsewhere in the bond, when a wide area of coverage was desired. For example, Insuring Agreement (A) refers to acts of employees "anywhere".

Third, Transamerica argues that the issuer of the bond must have been primarily concerned with the security measures taken by Northwestern itself on its own premises. It points to General Agreement A, which provides that if the insured establishes other offices, they are automatically covered, and goes on to say that the insured need not give notice or pay any increased premium unless the additional offices are due to a merger with or a purchase of the assets of another institution. However, in this Court's opinion that provision demonstrates that Transamerica was not concerned about the security of particular premises, since it did not even retain the right to be told about or to examine additional premises. Thus, if anything, the Court's conclusion is strengthened by that provision. To the extent that premiums could be increased upon a merger, the Court notes that this simply has a nice symmetry with Section 11 of the bond, which terminates coverage for the merged institution, and gives that institution a refund of the unearned premiums. In other words, one institution stops paying and the other institution picks up the expense.

Finally, if there is any residual ambiguity in Insuring Agreement (B), the Court will apply the fundamental principle that all such ambiguity should be construed against the issuer of the bond. *See, e.g., James B. Lansing Sound, Inc. v. National*

*Union Fire Ins. Co.*, 801 F.2d 1560, 1564 (9th Cir.1986). The fact that the drafting of the blanket bond may have been the joint effort of various associations and entities does not change this conclusion. *Shoals National Bank of Florence v. Home Indemnity Co.*, 384 F.Supp. 49, 54 (N.D.Ala.1974).

The Court is aware of certain cases that appear to have reached a contrary conclusion about the bond's language. *See, Sade v. National Surety Corp.*, 203 F.Supp. 680 (D.D.C.1962), and *Faroll v. National Surety Corp.*, 26 Misc.2d 548, 208 N.Y.S.2d 38 (N.Y.Sup.Ct.1960). To the extent that those cases do hold to the contrary, the Court respectfully disagrees with their reasoning. The Court, instead, agrees with the Texas Court of Civil Appeals' opinion in *Purolator Security, Inc. v. Citizens National Bank*, 546 S.W.2d 935 (Tex.Ct.App. 1977). There, a bank was relieved of its money after it was tricked into delivering that money to a book store. The Court said that the book store was premises "located anywhere" and if there were any ambiguity, the insurance company must lose.

■ In short, then, the bond does cover the loss of the securities in this case, and FSLIC is entitled to a summary adjudication of this issue.

B. *What jurisdiction's laws should be applied in determining the availability and amount of punitive damages?*

■ At the outset, there are three possible sources of punitive damage law that could be used in this case. First, federal law itself could supply the rule. Second, the rule could be supplied by the law of California.[2] Third, the rule could be supplied by the law of Missouri.

---

1. For example, Insuring Agreement (a); General Agreement (A); Exclusion § 2(1); and the Extortion Rider all refer to the Insured's offices.

2. It has been suggested to the Court that if California supplies the punitive damage rule for this case, FSLIC cannot recover punitive damages at all, since California will not permit an

assignment of that claim. That is not so. Regardless of California's law, the issue of assignability must be decided by federal law, if FSLIC is to perform the functions and exercise the rights given to it by Congress. Federal law does permit such an assignment. *See, Federal Savings and Loan Ins. Corp. v. Fielding,* 309 F.Supp. 1146, 1151 (D.Nev.1969).

FSLIC argues that there should be a federal law of punitive damages in a case such as this. It cites some cases where the courts have alluded to that possibility. *See, e.g., First Federal Savings & Loan Association v. Oppenheim, Appeal, Dixon & Co.*, 629 F.Supp. 427, 447 (S.D.N.Y.1986). This Court does not agree.

■ There is absolutely no persuasive authority for the proposition that the federal courts should create their own law of punitive damages for cases in which FSLIC becomes involved.

Surely, FSLIC can step into the shoes of a savings and loan whose claims it acquires, but that does not mean that a federal claim for unlimited punitive damages should then become available, regardless of the law of the state where the savings and loan was located. Permitting that would lead to the illogical result that FSLIC could collect more in punitive damages than the savings and loan could have collected if it had not failed. In other words, were the savings and loan in good condition, it may only be able to collect actual damages or some form of punitive damages, but if it failed at some time in the future, an entirely new party could step in and collect a great deal more. There is no need for a federal rule that would create that kind of uniformity for FSLIC at the expense of the kind of uniformity of decision and ability for advanced planning that citizens of the various states should be able to enjoy within their state's own boundaries.

That being said, the Court is faced with a choice of law decision. It is clear that the laws of Missouri and California are in substantial conflict about the amount of punitive damages FSLIC could recover in this action. Missouri places a limit of 20 percent of the first $1,500 of loss, and 10 percent of any amount thereafter. *See,* Revised Missouri Statutes §§ 375.296 and 375.420. In essence, California allows for unlimited punitive damages.

It can be said that each state would have some interest in having its law applied in this case. In deciding between them, the Court must apply the "comparative impairment" of interests approach set forth in

*Bernhard v. Harrah's Club*, 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (1976): that is, the Court must consider the interests of the two states involved and determine which state's interest will be more impaired if that interest is subordinated to the policies of the other state.

This case involves a Missouri savings and loan, which purchased a blanket bond from a Missouri resident insurer. The bond was delivered in Missouri, and covered actions of individuals who were dealing with the savings and loan in Missouri. On the other hand, the only connection with California is that defendant's home office is located in Los Angeles, and the final decisions to accept the bond and later to deny coverage were made in that office. California does have an interest in seeing that its resident businesses behave properly. Missouri has much stronger interests here. First, it has a direct interest in regulating the nature and effect of transactions conducted within its own borders between its citizens and resident insurers. Second, it has an interest in determining whether to allow suits for punitive damages with all their defects—enormous uninsurable liability exposure of businessmen; windfalls to suing individuals, who are compensated far beyond the amount of their own losses; increased cost to those consuming products, since businesses must raise prices to offset projected losses; and increased litigation, both meritorious and in the form of strike suits. Third, Missouri surely has an interest in determining how much punishment is enough, whether a percentage measurement is proper, or whether inflamed juries should be allowed to assess vastly disproportionate penalties. The Court fails to see why California's single policy interest is sufficient to allow it to reach out and affect what, for all practical purposes, was a Missouri transaction, and thus to disrupt Missouri's own scheme in this area. This is especially true where, as here, the windfall of unlimited punitive damages would not even inure to the benefit of a California citizen.

In sum, the Court concludes that Missouri's governmental interests would be se-

verely impaired by the application of California law to the issue of punitive damages. Conversely, California's interests will not suffer to any great extent because of the application of Missouri law.

■ Therefore, the law of Missouri will be applied to limit the amount of punitive damages, if any, recoverable in this case. Transamerica is entitled to summary adjudication of this issue.

### C. What amount must Transamerica pay under the provisions of the bond?

As noted above, the value of the securities at the time of the loss was $2,024,174. Since then Northwestern and FSLIC have been deprived of the use of the lost funds. The parties have agreed for present purposes that the rate of that loss is nine percent per annum. That is the statutory rate set by Missouri Revised Statutes § 408.020.

Transamerica, however, insists that "loss of use" is not covered by the bond, and it proceeds from there to a claim that when FSLIC obtained recoveries from others it had to prorate those recoveries between the uncovered "loss of use" and the covered principal loss. In making this argument, Transamerica places most of its reliance on the California case of *Graydon-Murphy Oldsmobile v. Ohio Casualty Ins. Co.*, 16 Cal.App.3d 53, 93 Cal.Rptr. 684 (1971). That reliance is misplaced.

The Court is inclined toward the view that the law of Missouri should be applied to this bond. More importantly, the Court does not need to engage in a lengthy choice of law analysis, because, in its opinion, the law of California and that of Missouri do not differ in any way relevant to this issue. Both states would permit FSLIC to apply the proceeds of the recovery as it has.

■ If the loss of use element were treated as a separate debt, then Missouri would allow FSLIC to apply the recovery to that element. *See, e.g., A.E. Birk & Son Plumbing & Heating, Inc. v. Malan Construction Co.*, 548 S.W.2d 611, 617 (Mo.Ct. App.1977). Where a loss is the type cover-

ed by a bond, Missouri will also allow the insured to recover the amount in excess of the penal sum before applying any portion of the recovery to the obligation of the insurance company. *See, e.g., Union Trust Co. v. Wyatt*, 58 S.W.2d 708 (Mo. 1933). These rules are variations of the well known common law principle that allows the creditor to direct the application of a recovery if the debtor does not direct otherwise.

Beyond that, it is common knowledge and common practice for creditors to apply payments to outstanding interest before they apply them to principal. *See*, 70 C.J.S. *Payment* § 75 (1951). In fact, for almost a century and a half the federal courts have adhered to the view that payments are to be applied first to interest and then to principal. *See, e.g., Southern Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1088 (5th Cir.1986); and *Devex Corp. v. General Motors Corp.*, 749 F.2d 1020, 1024 (3d Cir.1984). The Court has not found any contrary Missouri authority, and is confident that Missouri would not deviate from this rule. An argument can be made for treating loss of use in the same manner.

California law is no different. *See, e.g.*, Cal.Civ.Code § 1479 and Cal.Code Civ.Proc. § 695.220 regarding the allocation of payments. However, as the Court has already noted, Transamerica places great reliance on *Graydon-Murphy Oldsmobile v. Ohio Casualty Ins. Co., supra.* That case is not apposite. *Graydon-Murphy* dealt with a situation where the insured had suffered losses through embezzlement for a period that commenced long before an insurance policy came into existence, and also for a period after the policy came into existence. The insured then reached a settlement with the embezzler, without even informing the insurance company. The court found that it should, in fairness, apportion the recovery between the losses that occurred before the policy was obtained and those that occurred after it was obtained.

That kind of equitable allocation between periods may make a good deal of sense in the limited situation involved in *Graydon-Murphy*, and may even avoid the danger of

a fraud being perpetrated upon the insurance company, especially where the company was not even informed in advance. That is not this case. In this case, Transamerica would have been in a perfect position to protect itself if it had performed its duties under the bond. Since it did not do so, the Court should be loath to hear it complain that it would have made a different arrangement, or taken other steps to protect itself. *Cf., Samson v. Transamerica Ins. Co.*, 30 Cal.3d 220, 178 Cal. Rptr. 343, 636 P.2d 32 (1981); *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 151 Cal. Rptr. 285, 587 P.2d 1098 (1978); *Sunseri v. Camperos Del Valle Stables, Inc.*, 185 Cal. App.3d 559, 230 Cal.Rptr. 23 (1986); and *Bachman v. Independence Indemnity Co.*, 112 Cal.App. 465, 297 P. 110 (1931).

Furthermore, this is not an instance of losses occurring before the period of coverage, and losses occurring after it. The loss of use of the securities was part and parcel of the loss of the securities themselves. It was a part of the loss incurred while the bond was in effect, even if the particular form of the loss was not covered by the bond.

■ Therefore, FSLIC was free to apply the funds it was able to recover from others as it saw fit. Here it chose to apply them to its loss of use, and that meant that less money was available to apply to the loss of the bonds themselves. Even if loss of use should be treated like interest, it was proper for FSLIC to make the allocation the way it did. Again, if Transamerica complains that it would have made settlements that were more favorable to it and its interests, the Court can only note that it was Transamerica's denial of coverage that put it where it now claims to find itself. It left Northwestern and FSLIC on their own, to do the best they could to recover their losses by moving against the wrongdoers. FSLIC succeeded, and Transamerica's jeremiads should and must go unheeded.

■ Finally, FSLIC not only asserts a right to apply recoveries to the loss of use, but goes on to assert the right to recover interest on the $1,250,000 face amount of the bond. In this Court's opinion, FSLIC cannot do that, for it would then be receiving a double recovery. FSLIC has already recovered its loss of use damages by allocating the settlement proceeds to the loss of use portion of its total loss. An approach of this kind may seem to benefit Transamerica, which did not pay the loss when it should have. To some extent it does; but that is not unusual. If an aggrieved party does not suffer any loss from the other party's breach of contract, there can be no recovery of actual damages for that breach. So, had FSLIC recovered everything from others, it could not recover anything from Transamerica on the bond. That is true, no matter how bad Transamerica was. By the same token, to the extent FSLIC has recovered its loss of use elsewhere, it cannot do so again.

### III. CONCLUSION

Based on the above discussion, FSLIC is entitled to receive judgment for breach of contract in the amount of $1,321,198.82, plus interest at the rate of nine percent per annum from February 9, 1987 forward.[3]

---

**3.** The recovery is calculated as follows:

(a) Initial Loss: $2,024,174.00.

(b) Face Amount of Bond: $1,250,000.

(c) Recoveries:

| DATE | GROSS | FEES & COSTS | NET |
| --- | --- | --- | --- |
| 12/1/84 | $10,000 | $3,983.00 | $ 6,017.00 |
| 11/15/85 | 367,558 | $386,921.82 | (19,363.82) |
| 6/23/86 | 967,721 | 126,417.95 | 821,939.23 |
|  |  | 19,363.82 |  |

In addition, if FSLIC seeks to recover punitive damages under the other claims in its complaint, those damages will be limited in amount as provided by Missouri law.[4]

(d) Recovery Allocation [with allocation to "loss of use" or "interest"; as FSLIC did]:

| DATE | OUTSTANDING PRINCIPAL | 9% INCREASE FACTOR | RECOVERY | TOTAL DUE AFTER RECOVERY |
|---|---|---|---|---|
| 6/3/82 | $2,024,174.00 | $ –0– | $ –0– | $2,024,174:00 |
| 12/1/84 | 2,024,174.00 | 455,188.32 | 6,017.00 | 2,024,174.00 (Pr.)<br>449,171.32 (Inc.) |
| 11/15/85 | 2,024,174.00 | 174,189.39<br>+449,171.32 | –0– | 2,024,174.00 (Pr.)<br>623,360.71 (Inc.) |
| 6/22/86 | 2,024,174.00 | 109,804.20<br>+623,360.71 | 821,939.23 | 1,935,399.68 (Pr.)<br>Zero (Inc.) |
| 2/9/87 | 1,935,399.68 | 110,238.25 | –0– | 1,935,399.68 (Pr.)<br>110,238.25 (Inc.) |

(e) FSLIC recovered the "increase factor" for most of period from someone else. Transamerica need not pay interest on the $1,250,000 for that period. Thus, Transamerica owes interest on $1,250,000 at 9% from 6/23/86 to 2/9/87 in the amount of $71,198.82.

(f) Total judgment is (b) + (e) or $1,321,198.82.

---

**4.** The Court has been informed that FSLIC has decided not to pursue the punitive damage claims at this time.